Chief Justice Kobertson
delivered the Opinion of the Court.
Sometime in the year 1810, Elizabeth L., daughter of William Brockman, of Virginia, against her father’s advice, intermarried with Charles Bronaugb, a poor and rather prodigal young man, by trade a wheelwright; who, afterwards, in the fall of the same year, removed to. Kentucky, in company with her unmarried brother^ *310 Joshua L. Brockman; to whom her father delivered some slaves, to be kept and controlled, in this state, in trust for her benefit.
J°s^ua L. Brockman accordingly brought the slaves to Kentucky, and, living with Bronaugh and wife, exercised dominion, according to the trust, until after Bronaugh’s death, which occurred in January, 1811.
As Bronaugh owned but little, if any, property, excepting his tools, and a horse and gig, and an interest in a bond made payable to himself, for one thousand dollars, which had been advanced by him to John Rochester, on loan, in the absence of Joshua L. Brockman, and a part, probably the greater part, of which was the money of the said Joshua—his effects were retained and disposed of by his widow and her said brother, without a formal administration.
About two years after Bronaugh’s death, William Brockman gave to Joseph Mason, with whom the widow had, in the mean time, intermarried, the slaves he had previously delivered in trust to Joshua L, Brockman.
Ann Eliza Bronaugh—the only issue of the marriage between Charles Bronaugh and Elizabeth L. Brockman, and who was reared and educated by Joshua L. Brock-man and her mother and step-father—having intermarried with one William Underwood—-he, not long after-wards, that is, in the winter 1832, asserted a claim, in consequence of his marriage, to all the slaves who had beep delivered by William Brockman to Joshua L. Brockpian, to be brought to Kentucky for his daughter’s benefit, and to all the increase of those slaves, and also to the value o.f the. horse and gig and tools, and to the whole sum loaned to Rochester, and legal interest therein from the date of the bond which Rochester had given, and the amount of which had been collected by Joshua L. Brockman, after the death of Bronaugh.
The facts exhibited in the. record show satisfactorily, that Mrs. Underwood had received from Joshua L. Brockman a horse worth as much as that of which her father died possessed; that the gig and tools were not worth, at their utmost value, more than one hundred and fifty dollars; and that a portion of the money loaned *311 to Rochester, and probably as much as seven hundred dollars thereof, belonged to Joshua L. Brockman, and there is neither proof nor intimation, that Charles Bronaugh owned, at the time of his death, any other estate than that which has been just enumerated and described— unless he had title to the slaves, and the proofs leave no reasonable ground to doubt, that he never had any ves* ted or legal right to any of them.
A Writing, called “acompromise’* which Underwood obtained from Brockman, Bronangh’s widow and others, by threatening them with suits.
According to these deductions, it would appear that, the widow being entitled to one third, the distributive interest of Mrs. Underwood, could not have exceeded three hundred dollars, at the time of her father’s death* But even if her father owned the whole of the thousand dollars loaned to Rochester, the utmost value of her interest could not have been greater than about seven hundred and sixty dollars—and there can be no doubt that, her maintenance until her marriage should extinguish all pretence of claim to interest on her distributive portion.
Nevertheless, Brockman being disabled by a protracted rheumatism, which had confined him generally to his bed for about fifteen years, and moreover being so much alarmed and disturbed with the apprehension of a suit, with which Underwood threatened him, as, in the opinion of many persons, to be non compos; and Mrs, Mason—whose last husband was then dead, leaving four infant children by her, and one child by a former wife—> being ignorant and fearful of the annoyance and danger of a suit—Underwood succeeded in procuring, what he denominates a compromise, in writing, signed. May 25th, 1832, by himself and by Brockman and one Kay, the husband of Mason’s daughter by his first wife, and by Mrs. Mason, as guardian of her four infant children by Mason—whereby it was stipulated, that Underwood and wife and Mason’s five children should have equal distributive interests in all the slaves, and also in a tract of land which belonged to Mason at the time of his death; and, as the slaves had been previously divided between Mrs. Mason and Mason’s five children, it was agreed that she, as guardian for her four infant children, should pay to Underwood, five hundred and sixty-two *312 dollars, and that Kay, for himself and wife, should pay him one hundred and twelve dollars, forty and one third cents, in lieu of his conventional sixth part; and it was also agreed that, at the death of Mrs. Mason, Under-J wood should have one sixth part of tlie Slaves allotted to her for dower, and should also be entitled to a sixth part of whatever property might, in the mean time, come to her by “gift, descent or otherwise, from her father or motherand the writing also recited, that Underwood and wife had been “greatly induced to enter into this amicable adjustment,” by the fact that Brockman had, “by deed, of gift,” secured to them, at his death, one sixth part of his whole estate.
Money and land extorted from Brockman, by Underwood, under pretence of of his wife.
Judgt’s against BrocUmarT her surety, on’notes promise;and°the present bill—to ments,threicbfd the compromise, for fiaixd, &c.
Ans. of B. and for restoraUon'of the money and ftomahta?t0rted
Ans. of Ifay.
Ans. of aUnderwood‘
In addition to the foregoing contract, Joshua Li Brock* jpan about the same time, gave his note to Underwood \ . . , , , r for nine hundred and thirty-nme dollars, whitíh he alterwarc|s paid to him, and also, on the 10th of Mav, 1832s conveyed to him a tract of land containing about four hundred acres, and worth between sixteen hundred and two thousand dollars—for no other consideration than Underwood’s claim in right of his wife.
Mrs. Mason having given her obligation for the five hundred and sixty-two dollars, and also for the one hun* dred and twelve dollars, forty and one third cents, and Underwood having obtained judgments on both obligations against her, and also against Joshua L. Brockman as her surety—she and her four infant children tiled a bill in chancery against Underwood and wife, and Kay an(j an¿ against Joshua L. Brockman, for enjoining the judgments, and for rescinding the contract of com* promise, for alleged fraud, surprise, and want of consideration.
Brockman made his answer a cross bill against Undei’* wood, and, on the like grounds, prayed for a cancelment 0f the deed for the tract of land, for a restitution of the «hie hundred and thirty-nine dollars, and for general relief.
Kay, in his answer, concurred in the allegations and prayer of the bill.
But Underwood denied the charges of fraud, and insisted that he was justly entitled to all the slaves and *313 lo the whole of Rochester’s bond and interest thereon, and that, therefore, he had not obtained as mudr by his contracts as he was entitled to; but that, if he was not entitled to the slaves, or to any interest in thém-, of to more than three hundred dollars of Rochester’s bond, still, as the controversy was settled by compromise, without fraud, the chancellor, who favors such adjustments of family disputes, should not disturb thé contract of the parties;
Recrée 'of thé Circuit contra.
and for oiher deAn ináiviáuai bets up an unfounded claim to certain slaves,thé property of infant heirs; their mother, being their guardian, and being threatened with suits for the slaves minds connected with the samé claim, is induced to give her note, With security, by way of compromise for a certain portion of the value of th's slaves; judgment isobtainedonthe nóte and she and her children file a bill, with injunction, to be relieved against . the judgment^set aside the compromise &c. (ui supra) held, that a compromise made by a guardian, of a baseless claim against the wards, shall not bind them; nor shall the obligation given upon the compromise, he enforced against her individually. °
The husband of a co-heir, who had, without the participation of his wife, acquiesced in the compromise, and given his note for her rateable proportion, shall, for like reasons, be, in like manner relieved, especially, as the contract was executory, and not executed.
Vide post—for additional reasons, upon which the agreement and “compromise” mads by the guardian, might be set aside.—p. 320,
The Circuit Court, however, perpetuated the injunctions to the judgments; rescinded the contract between Underwood and Mrs. Mason and her children, and decreed a re-conveyance to Brockman, of the tract of land which he had conveyed to Underwood, and a can* celment of the deed of gift for one sixth of his estate; And Underwood-, having appealed, now insists that thé decree is altogether erroneous, and should therefore be reversed by this Court.
Not doubting, that according to uncontrover'ted facts; Bronaugh had no fight to any of the slaves, and that, consequently-, Underwood had no interest whatever in them, we are, of course, perfectly satisfied that there was no solid consideration for the agreement made by Mrs. Mason, as guardian for her infant children. Nor can we, therefore, doubt that that agreement was the fruit of fraud, actual or constructive, or of that kind of surprise, or ignorance of fact, or of law, which should entitle the infants to a rescission. For it seems to us self-evident^ that a court of equity should not sanction ■or uphold a compromise by a guardian, so baseless, improvident, and palpably unjust. And therefore, the decree, as to that contract is approved and affirmed, so far as the infant parties may be concerned.
And, as Mrs. Mason acted chiefly as guardian in the entire arrangement, she should not, under all the cir *314 cumstances, some of which will be presently considered, be held personally liable; and therefore, as to her also, the decree is approved.
A party may té chancerytfrorna cohtrhctmadeuu der mistake as tó a material fact.
Discussion of tho question, whether a party can he relieved from a contract made, with a full know! ■edge of all the facts, upon the mere ground of a mistake as to the law. And, 1 held, that where it is clearly established, that a party having a full knowledge of the facts of his case, erroneously believes that gal liability, and 3nthatatconsid-f eration only, en-tract,1111whLTfii truth no legal fiom^the rfects! fie may be roeery, upon the ground of mia- ¡¡^ 0f the iaw. j , Where a demand 0r claim is asserpa^?e3 difi fering as to their j^riiiX^make a fair compro^distuXed "on account of any oFttie case?
*314 And as to Kay and wife, also, we are of the opinion. that, the decree should be sustained; because it appears that, their acquiescence was merely incidental, or consequential to the agreement made by Mrs. Mason and by Brockman, without any active agency, or voluntary participation, or personal knowledge of either facts or law; and because, also, the agreement is chiefly executory and should not, therefore, affect Mrs. Kay, who does not appear to have ever given any binding or prop4 fer consent.
As to so much of the decree as affects the contracts between Underwood and Brockman alone, and for themselves only, there may be more reason for some doubt.
That there may be such a mistake as to a material fact> as to entitle a party to exoneration from a contract made under the influence of such a delusion, is not , ,11-1 3-nd CciHUOt DG ClGlUCd*
But the counsel for Underwood insist, that there could have been no such mistake as to any fact respecting his claim against Brockman, as, per se, to entitle the latter to a rescission _of bis agreement; and they also have argued, that no mere mistake as to the law can alone be sufficient for setting aside the contract.
We admit that Brockman should be presumed to have been acquainted with all the facts material to a correct ascertainment of the nature and extent of his liability to Underwood, and that moreover, there was no such relation of trust or confidence between them, nor any such obligation on Underwood to communicate any thing j knew, as to authorize the deduction that there was any fraudulent delusion as to material lacts. But we are not prepared to concede, that no mistake, as to any matter of law can ever be sufficient for invalidating a contract. On this point, there has been a long, and obstinate, and hitherto unsettled, controversy among both practical and elementary jurists, divided generally into two great parties, each endeavoring to maintain an ex *315 treme doctrine, the converse of that of the antagonist party, and either of which, to the unqualified extent assumed, is, in our opinion, equally indefensible upon principle or analogy. The doctrine of one party is that— as the efficacy and authority of law depend on the necessari/ legal presumption, that every citizen knows all the . J , : * ,, r J laws of his country—therelore, no one should, m any case, bo allowed to plead ignorance of the law, or should 7 ao / be entitled to relief from the legal effect of a fair contract, merely in consequence of his actual ignorance or mistake as to the law. The argument of the opposite party is, that the maxim ignorantia juris non excusat, applies only- to criminal or penal cases, and'between the citizen and his government; and that, as there can be no binding contract unless the minds of the contracting parties were both free and intelligent, therefore igno-: ranee or mistake, as to a matter of law, should entitle a party to. be relieved from a contract superinduced by. such ignorance or mistake, in every case in which simb lar ignorance or mistake as to any fact, would give an equitable title to relief.
This same diversity existed to a great- extent among* the civilians; and as to the right to repetition, in a case in which money had been paid under a mistake as to the legal liability of the payor, we find Cujas and Ileineccius in the negative, and Vinnius, Domat, HJlgguesseau, and Pothier in the affirmative. .
Common, law jurists have, in- the like manner, taken opposite sides of similar questions, in Harman v. Camm, 4 Vin. ab. and in several other cases adjudged in Eng^ land, it was said, that ignorance of law would not avail in a civil, any more than in a criminal case. And, in Shotwell v. Murray, 1 Johns. Chy. Rep. 516, and Lyon v. Richmond, 2 Ib. 51, Chancellor Kent recognised the same doctrine.
But in Lansdowne v. Lansdowne, Mosely 364, and Simpson v. Vaughan, 2 Atkins, 33, as well as in some other British cases, the opposite doctrine was asserted. And this Court, in Fitzgerald v. Peek, and in many other cases, has given relief on the sole ground of a mistake or ignorance as to the law. The Court of Appeals of Vip*. *316 ginia has taken the same course. S ee Price's Ex'or. v. Fuqua's Adm'r. 4 Munford, 68.
Even Chancellor Kent, notwithstanding the unqualified opinion which he expressed in the cases reported in 1st ana 2d Johnson, supra, said, m the subsequent case of Storrs v. Barker (6 Ib. 169)—“it is rarely that a mistake in point of law, with a full knowledge of all the facts, can afford ground for relief, or be considered as í* a sufficient indemnity against the injurious consequen- “ ces of deception practiced upon mankind” &c. “it would therefore seem to. be a wise principle of policy « that, ignorance of the. law, with a knowledge of the “ facts, cannot generally- be set up as a defence.”
In Hunt v. Rousmanier, 8 Wheaton, 214, and 5 Con. Rep. 401, the Supreme Court of the United States, after expressing a similar opinion as to the general rule of policy, qualified it by admitting, that it was not universal, and that there may be cases in which mere ignorance of law alone would entitle a party to relief in a civil matter, on the ground, as suggested, of the presumption 'bf imbecility, or of fraud, which might arise; and the Court might have added also, the additional and more conclusive and plain ground of a want of consideration.
And should there be any doubt—can there, upon principle, or even policy, be any doubt, that if, without any Other consideration, good or valuable, moral or legal, than an erroneous opinion that he is legally bound, A shall have paid, or assumed to pay, B money, he would, in conscience, and in judgment of law, be entitled to restitution or exoneration? If he had paid, upon what principle of law or ethics, could B claim the right to hold? o.r. if he, had only agreed to pay, why should the law compel, payment? Ignorance of law, of either the civil or the moral code, should not excuse a rational being from the prescribed responsibility for a voluntary yiolation of it; because, so far as civil and moral conduct may be concerned, it is the duty of every intelligent citizen and moral agent to know the law and his ipwn obligations, and no government, moral or political, ^ould prevail or be upheld, if a plea of voluntary igno *317 ranee would excuse an infraction of its prescribed rules of conduct. Universal anarchy and licentiousness would be the natural consequence of allowing such a defence to be sufficient to entitle the offender to impu- . A nity.
But the same reasoning does not apply to contracts, or to private rights. It is well known, that all persons do not understand some of the plainest rules of law, and that no person, however enlightened, knows all the law. And if one, ignorant of a plain principle of law, shall, without any other motive or consideration than an er-erroneous opinion respecting his legal rights and obligations, release a right, pay money, or undertake to do, any act, what principle of law, or dictate of justice or. policy, would require him to be bound, as with a gordian knot, which nothing but the sword could unloose?
Why should he be punished in such a case, for such ignorance? or why should the other party be enriched, or benefitted, without any equivalent or merit of any kind or to any extent whatsoever? A mistake of fact might be sufficient to entitle to relief or exoneration,^ because such a mistake would show, that the contract was not such as the parties, or at least one of them, con-, templated or would have made, had there been no mistake. Might not a mistake as to the lem, in a parallel case, be equally availing, and for precisely the same reason? Undoubtedly it might, and, as we think, should; and such we understand to be the rational and consistent doctrine of the common law established in Kentucky.
But, as it is generally difficult to prove satisfactorily, that a party was ignorant of the law, or that such igno-, ranee was the only consideration which actuated him, it is, of course, not so easy, and, therefore, has not been so common, to obtain relief on the ground of a mistake as to the law, as on that of ignorance or mistake, respecting a material fact. And even when it may be evident that there was a mistake as to the law, yet if the question of law were doubtful, and the parties, differing in respect to what was the true rule, had, in con-, sideration of its uncertainty, and in consequence of their *318 diverse opinions respecting it, made a fair compromise of conflicting and honest claims, their contract should stand; because the doubtfulness of the legal right and a desire to avoid the expense and uncertainty of litigation would be a valuable, meritorious, and all sufficient consideration to give it legal and effectual obligation. And were this not so, no compromise of doubtful rights would ever stand; because, in every such case, the one party or the other, must have been mistaken as to the law, or the facts, or both.
One whom disease and confinement had made feeble in body find mind, being persecuted with a claim, for the most part, with-put foundation— pnters into a com promise, so iniquitous as to be, per se, evidence pf surprise, inpompetency,fraud pr ignorance of the law: held, plat he is entitled to relief from the compromise, and from the claim on which it was founded, so far as that claim was unjust; and the demands against him, so far as they had any semblance of justice, having been fully satisfied in money, he is entitled to are conveyance of land, which he had conveyed in the ^mprpmise of the fraudulent demands.
*318 T But when it can be made perfectly evident, that the only i consideration of a contract was a mistake as to the legal rights or obligatioas of the parties, and when there has been no fair compromise of bona fide and doubtful claims, we do not doubt that the agreement might be avoided on the ground of a clear mistake of law, and a total want, therefore, of consideration or mutuality.
In this case, as between Brockman and Underwood, it is obvious, that there must have been surprise, incompetency, fraud, or ignorance as to the law; for, as Underwood only claimed of him the thousand dollars with interest, and the value of the gig and the tools; and there seems to have been no pretence for claiming more, and as it is evident that, after deducting the widow’s third part, and even not more than the legal rate of interest on the residue, for the maintenance of Underwood’s wife, not more than about seven hundred and sixty-six dollars would remain due—there can be no doubt, that if Brockman had sufficient capacity, and there was neither fraud nor surprise, he must have been induced to make the contract by an apprehension that, as there had been no regular administration, he was legally liable for the whole estate andinterestupon.it, and even also for damages for a violation of law. lie alleges in his cross bill, that Underwood took that ground, and alarmed, and, from time to lime, annoyed him with threats of a suit which would expose and perhaps ruin him; and that allegation has not been directly or sufficiently denied. And here, without going farther, might be found a ground sufficient for rescinding the contract, in part at least: for, considering the situation of the parties, the facfs of the case, *319 and the nature of the contract, the cross bill and the answer to it furnish, in the particular just noticed, sufficient evidence of fraud, arising by implication from the facts and from the conduct of Underwood.
That, a party whose mind was impaired by disease, was assailed, from time to time, with a charge that he had assumed an illegal authority, and made to believe that he had incurred a heavy responsibility, & was thus induced to compromise a fraudulent claim —is a sufficient ground for granting him ielief, against the compromise& claim.
ButtheTacts being, as they must have been, well understood by both parties, there was, beyond the amount of the bond given by Brockman, according to the uL most rational calculation, not one cent due to Underwood, and there was no semblance of reason for claiming more, if indeed there was any for claiming even that much. To any greater extent, therefore, there was nothing doubtful which could form the basis of a binding compromise; and consequently, the claim to any greater extent, should be deemed to have been fraudulently fabricated, and the alleged compromise, so far as it included the four hundred acres of land, should not be permitted to operate as an obstacle to the relief decreed.
Lord Eldenhas taken the ground, that a compromise may be se-t aside for an obvious mistake of plain law, when, of course, there was no other motive for it, and consequently, nothing reasonably or intrinsically doubtful to be compromised. And many other Judges have followed him.
Whether, therefore, the compromise is evidence of fraud, or surprise, or imbecility; or whether there was an evident' mistake of plain law, and was therefore nothing fit for a compromise, is not material; for it seems clear to us, that some one or all of these several hypotheses should be admitted to be true; and if any one of them be so, the decree for a re-conveyance of the land, was not unjust or erroneous.
But, in addition to the foregoing considerations, we cannot forbear to notice the helpless condition of Brock-man, and the fact that some of his intimate acquaintances and neighbors were of the opinion that, in consequence of confinement and disease, and the conduct of Underwood, he was incompetent to make the compromise. This alone, when combined with the unreasonableness of the contract, should be deemed altogether sufficient for determining its invalidity.
Wherefore, it is the opinion of this Court, that the *320 Circuit Judge did not err in decreeing a remonveyaritíés The nine hundred and thirty-nine dollars, which Under* wood received aird has been permitted to keep, is surely as much as he had á semblance of just reason to expect or demand.
Decree ofthe eirsuit court erroneous m setting aside a certain ^toU—because itdoesnotappear parTof Cie'convpromise (supra) ^ay^foi^rélief against it.
Decree as to the Coart. in thlS
But we are constrained to disapprove só much of the ¿egree as cancelled the “deed of gift:’1’’ first—'because it . , , , • • 1 does not appear that, that deed had any connection with the compromise; and, second—because it was neitheP exhibited in the case, mentioned in the cross bill, nor embraced, even constructively, in the prayer for relief» As it was not, therefore, a subject of litigation-, the Circuit Court had no jurisdiction over it, and consequently, no power to make any decree respecting its
Much that has been suggested in this opinion about the compromise with Brockman, would, were it deemed necessary to make the application, apply as fitly and effectually to the contract made by the guardian; thé decree respecting which has been sustained on a ground peculiar to that branch of the case, without relying, to the full extent of their just effect, oil all the considerations which might, with propriety, have been brought to bear upon it, as effectually as some of the like circumstances and deductions have been applied to the contract between Brockman and Underwood.
Wherefore, it is decreed and ordered, that so much of the decree as perpetuated the injunctions to the judgments at law, and rescinded the contract between Mrs. Mason and Underwood and others, and directed a re conveyance, from Underwood to Brockman, of the tract of four hundred acres of land, he, and the same is hereby affirmed. But it is also decreed and ordered that so much of the decree as cancelled “the deed of gift,” as it has been Called, be and the same is hereby reversed.
And it is finally ordered, that the appellant, Under. wooc^ pay t° the appellees their costs in this Court, on the original bill.; but as between him and Brockman, on the cross bill, as that presents a case within the discretion of this Court, and there has been a partial reversal and a partial affirmance of the decree of the Court below, there will be no order respecting costs here.