4m178
100  47
4bm178
104  788
4bm178
j 110 716
j 110 719

CHANCERY.

*Case* 38.

## Gratz *vs* Redd.

APPEAL FROM THE LOUISVILLE CHANCERY COURT.

*Corporations. Choses in action. Mistake. Trusts and Trustees.*

October 11.

CHIEF JUSTICE EWING delivered the opinion of the Court.

Date and provisions of the charter of the Rail Road Company.

THE Legislature of this Commonwealth, by act approved the 27th day of January, 1830, incorporated a company, with a capital of one million of dollars, to be raised by subscription, in shares of $100 each, to make a rail way from Lexington to the Ohio river; fixed the tolls they were authorized to charge for passengers, transportation, &c. and authorized them to commence running their cars and charging tolls as soon as fifteen miles of the road should be completed.

Dividends declared.

By the 22d section it is provided, "that the President and Directors shall annually or semi-annually, declare and make such dividend as they may deem proper, of the *net profits arising from the resources of said Company, after deducting the necessary current and probable contingent expenses,* and divide the same among the stockholders in proportion to their respective shares." The corporation having completed the road to the extent of the fifteen miles and more, commenced running cars and taking tolls on that part. The Board of Directors, on the 20th of July, 1835, declared a dividend of 4¾ per cent. on eighty dollars per share then paid in; and on the 7th January, 1836, a dividend of 2 per cent. on $90 per share then paid in, for the six months ending the 1st January, 1836, and on the 30th December, 1836, a third dividend of 4 per cent. per share for the year ending the 1st January, 1837. The first dividend declared was directed to be placed to the credit of stock due, and the second and third were divided in cash.

Committee appointed to examine books &c. and their report.

Upon due notice, under the charter, a meeting of the stockholders was called in October, 1837, one of the objects of which was to take into consideration the acts of the directory in declaring these dividends. A committee

appointed by the meeting, upon inspection of the books, &c. reported in substance, that there were no profits at the time those dividends were declared, and recommended that a committee be appointed with powers to examine the books and affairs of the corporation more closely, and state accounts, and make report to an adjourned meeting of the stockholders, to be held on the 20th November, 1837. This report, with appended resolutions, was adopted, and a committee appointed, who reported to the adjourned meeting in November, the state of the accounts, and in effect, that there had been no profits.

Reference to Judge Robertson *et als.*—

Whereupon, the accounts of the corporation were submitted, by the adjourned meeting in November, to Judge Robertson, Judge Owsley and Silvester Welch, with a request and authority to examine and decide whether the President and Directors had, at any time or times, improperly declared and made dividends among the stockholders; "to decide the amount improperly divided, and the mode by which dividends so improperly declared and made, should be refunded to the Company."

—Their report, and the action of the directory thereon.

They in substance decided: 1st. That there was no surplus profits to divide at either of the times when dividends were declared.

2d. That so far as credits may have been given to stockholders, on their stock accounts, for dividends improvidently declared, those credits should be erased, and the stock thus improperly credited, should be deemed yet due and payable on demand, without interest.

3d. "That so far as money shall have been actually paid to any stockholder, on account of any dividend which has been declared, it shall be refunded forthwith, without interest, by the person only who received it, or by his or her legal representative, if his or her stock shall have been assigned to another since the receipt of such dividend, and that when there shall have been no assignment subsequent to such receipt of dividend, the present stockholder shall be liable therefor; and no such present stockholder, or his or her assignee hereafter, shall be entitled to any future dividend, until the amount so actually received, in money, shall have been refunded, with legal interest thereon from this time, or until the profits to

GRATZ
vs
REDD.

which such stockholder may hereafter be entitled, shall have extinguished the amount so received, and legal interest thereon from this time."

4th. To prevent any difficulty hereafter, in respect to the interest on the $150,000 borrowed by the Company, they suggest explicitly, as their opinion, that it should be paid out of the profits.

Said award was reported to the Board of Directors, on the 7th December, 1837, received and approved by them and ordered to be spread on their minutes; and at a subsequent meeting of the board, on the 13th June, 1838, it was resolved "that the President be authorized and requested to carry into effect the said award in relation to the dividends, according to the terms thereof, and that he be authorized to receive from said stockholders or others, their negotiable notes for any balances that may be due from them on account of said dividends or otherwise." Each of the stockholders, and among them the defendant, Gratz, was notified by the President, of the foregoing proceedings, and of the amount due, and payment thereof demanded.

The complainant, Redd, having recovered two judgments in the Jefferson Circuit, against the Company, one for $741 60, with interest from the 28th October, 1838, and costs, the other for $288 60, with interest from the 10th day of October, 1838, and costs, and having executions returned, "no property found," filed his bill in the Chancery Court of Louisville, against Gratz and the Company, to subject the demand due from Gratz to them, for dividends improperly declared and paid to him, to the payment of his judgments and costs. He charges that all the property of the corporation is under mortgage to the Commonwealth of Kentucky and to the City of Louisville, for more than it is worth, and that the Company have nothing that is liable to execution: but that there is due from various stockholders, a large sum, for and on account of *dividends improperly* divided, at a time when there was *no profits to divide,* and sets forth and charges the various steps taken by the stockholders, at their meeting and adjourned meeting, and committee's reports, resolutions, submission and award, and the report of the

Redd's claim, & its character— grounds of equity.

award to the directory, and their acceptance, sanction and approval of the same, and entry thereof on their books, and notification of each of the stockholders, to refund the amount so improperly divided; that Benjamin Gratz was one of the stockholders when those dividends were made, and was present at the meeting of the stockholders when the investigation was ordered and when the report of the committee was received, and when the order of reference was made, and was in the Board when the report was made, and received and approved by the Board; that he had received $1296 of these improperly declared dividends, on account of stock which he held in the company, which was liable to be attached and applied to the payment of his said judgments. He makes Gratz and the Company defendants, and calls upon them to answer and exhibit all the orders and resolutions on the subject of these dividends, and prays that Gratz *pay over* the amount due from him, in satisfaction of his judgments, and for *general relief.*

Gratz's answer and cross bill.

Gratz answers and admits that he was a stockholder and *director when all the dividends were declared,* and received, either in a credit on his stock or in cash, the dividends declared on his stock, which amounted in all to $1296: but he denies that they were improperly declared, or that the Company have any claim upon the stockholders for the amount. He impliedly admits that he was present at the called meeting in October, but denies that he was present at the adjourned meeting in November, when the order of reference was made, nor was he in the board when the report of the referees was received and approved, and states, that so soon as he was apprized of what had been done, he protested against the whole proceedings, and now contends that the same was irregular, illegal and not binding on him; that he had no notice of the same or of the meeting of the referees, and makes his answer a cross bill against Redd and the company; calls for an exhibition of the orders and steps taken; charges that the Commonwealth of Kentucky and the City of Louisville have a mortgage on the Railroad to secure large sums due them, and are interested in the result; protests against charging against profits the in-

GRATZ
*vs*
REDD.

terest upon the $150,000, borrowed upon the pledge of the State, and prays that the award may be set aside and overruled.

Redd answers the cross bill of Gratz, and says, ''that

Redd's answer to cross bill of Gratz.

the reason that Gratz was selected out and sued was, that he was a *director* at the time the order was made for ar· bitration, and was a *director when all the illegal dividends were made*, and he instituted this suit against him solely with the hope of making his debt out of a corporation, a *part of whose funds he believes and charges* have been *ap-propriated in dividends*, when in truth *no profits were made to declare dividends on*."

The Company answer the bill of Redd and the cross

Answer of the Company to the cross bill of Gratz.

bill of Gratz, admitting the judgments of Reed and the returns of no property, and the insolvency of the Com. pany and total want of means to pay them; that divi-dends were declared and· divided by their predecessors when there *were no profits to divide*—the first in July, 1835, the second in January, 1836, and the third in Janu-ary, 1837—and set forth extracts from the books showing that Gratz was present when all these dividends were de-clared, and concurred in the orders and received the first dividend as a credit on his stock, the two last in cash, amounting in all to $1296. They *exhibit with* their an-swer, extracts from their books of all orders relating to the dividends declared, and of all the accounts bearing on that subject; set forth the amount due from each stock-holder on account thereof, and the notice given by the President, under the order of the board, to refund, and state the failure of many of them to do so, among others, Gratz, their co-defendant, by reason whereof the Com-pany is rendered unable to pay its debts or meet its en-gagements, and make their answer a cross bill against all the stockholders, and pray that they may refund the divi-dends so improperly declared according to the award and order of the board thereon, and for general relief.

No process having been served or steps taken on this

Decree of the Chancellor.

cross bill to bring it to a hearing, the Chancellor dismis-sed it without prejudice, and decreed Gratz to pay to the complainant, Redd, the amount of his judgments and costs; the amount of dividends received by him being

more than the amount of the judgments, and Gratz has appealed to this Court.

It is objected : 1st. That it appearing from the allegations of Redd's bill, as well as from the answer of Gratz, the Commonwealth of Kentucky and City of Louisville held a mortgage upon all the property of the Railroad Company; that they are entitled to the fund in Gratz's hands sought to be subjected to the payment of the complainant's demand, and should have been made parties and brought before the Court.

A mortgage upon the *property* of the company should not be understood necessarily to embrace *money*, the proceeds of stock paid in, to be applied to the construction of the road, nor money, the proceeds of profits derived from its use, until the road is taken possession of by the mortgagees. The mortgages are not produced, and in the absence of all proof that the mortgages do embrace and entitle the mortgagees to the fund in contest, we will not presume that they do embrace so fleeting and evanescent a thing as money, which has no ear mark, and can afford but little security to a mortgagee. If they did embrace and cover the fund in contest, it was competent for Gratz, who knew of and had set up their existence, and that they embraced this fund, to produce them, and failing to do it, may be implied their production would have availed him nothing.

Looking into the Session Acts in relation to this Company, we find by an act of 1833, (*Statute Law*, 1832–3, 263,) that the company were authorized to borrow $150,000 on the faith and credit of the State, and to indemnify the State the Company were required to assign, by way of mortgage to the State, "all its lands, tenements, machinery, or other property of whatsoever description it may hold or possess, or may hereafter hold or possess, including their interest in said road, and all their stock *laid out and expended on said road*, with all its rights and privileges now held by virtue of the laws of this Commonwealth, and which may be granted."

Presuming that the mortgage held by the Commonwealth alluded to, is one taken under the authority of this act, and that it was taken in conformity to its provisions,

GRATZ
vs
REDD.

The mortgage by the Railroad Company did not necessarily convey with it the tolls made by the company in the use of it before possession taken by mortgagee.

The Statute of 1833, authorizing a loan by the Railroad Co. on the credit of the State, (*Sess. Acts.* 263,) and its construction.

The mortgage of the State on the Railroad in this case did not embrace either the

GRATZ
*vs*
REDD.

stock paid in by the stockholders, or the tolls collected by the Company in the possession and use of the Company.

the question arises, whether a mortgage thus taken should be construed to cover and embrace the money in contest? We think it should not. The term *property* is often used in common parlance to express the right or ownership in a distinguishable *thing*, susceptible of identification and contradistinguished from *money*, and we think the term was intended to be so used in the present case. *Lands, tenements* and *machinery* cannot be construed to mean *money*, and "other property of whatsoever description it may hold or possess," immediately following those terms, should be understood to mean *property* of the *like kind*, and their *interest* in the road means their interest in the *thing*. If the stock subscribed was intended to be embraced, the term *stock* would have been much more definite, significant and appropriate than the general terms used, and most likely would have been used, and that the money paid in on stock was not intended to be embraced before it was expended, is clearly to be implied from the words which follow: "their stock *laid out* and *expended* on said road." It can hardly be presumed, nor can such construction be indulged in, that while the Legislature was pledging the faith and credit of the State to aid the Company to raise the money to be expended in the completion of this grand work, in which the whole public felt so deep an interest, that they intended to embarrass its progress by requiring the very money that was borrowed to complete it, as well as the funds paid in, on stock to that end, to be embraced and covered by their mortgage, so soon as it reached the hands of the directory; if so then might the directors have been rendering themselves personally responsible by laying it out in the payment of the very debts contracted for the completion of the work, and those to whom it was paid might perhaps have been made to refund it to the State as a trust-fund upon which she had the prior lien. It is true, the State by the mortgage of all interest in the Railroad to her, might assert her claim to the profits, but having left the mortgagees in the possession and permanency of the profits, she could not claim them until she took possession or otherwise set up and asserted her right to the same, and would not be allowed to reclaim

them after they had been used or distributed among the shareholders; and the more especially as she held the mortgage as an indemnity only against *liability*, and there is no evidence or reason to believe that she had been subjected to responsibility, or made to pay either principal or interest on the bonds which she had secured before the dividends were declared or distribution of the profits made. If, therefore, the money in Gratz's hands was capital paid in on stock, or derived from the money borrowed, or profits, the State has no interest in it; if capital paid in, it had not been expended on the road; if profits, she had not asserted her claim or been subjected to damages. She had, therefore, no interest in the fund, and was not a necessary party.

The meeting in October was regularly called by the competent number of stockholders, in value, and upon due and regular notice, and the competent and legal number of shareholders attended, or the competent quantum of stock was represented, and among them was Gratz; so also was the adjourned meeting in November regularly held. Both meetings appertained to and concerned the business of the Company, their liabilities, expenditures, finances and resources; the actings and doings of their Directors, and especially their actings and doings in relation to the dividends declared; the funds out of which they had been declared, and the propriety of declaring them; and their resolutions, reports and proceedings are evidence against and binding on the individual members or the Company, so far as their action and proceedings went. They all had an opportunity to attend and take part in the proceedings, and if they did not choose to attend, it was their own fault, and they and each of them are as much bound by the proceedings of the meetings, there being a competent number in value in attendance, as if they had all been personally present. The notice prescribed by the charter having been given, they must be deemed to have had constructive notice of the meetings and of the objects of them, and their action upon, or in relation to the corporate funds, whether they remained in the hands of the directory, or had been distributed improperly among the members of the Company, was com-

The acts, resolutions and proceedings of an incorporated company, through their directory, are competent evidence against the company, and especially a director who was present.

GRATZ
*vs*
REDD.

petent and within their legitimate powers. The stock of Gratz was represented by himself or proxey, at the meetings in October, and the inference may be deduced from his answer that he was personally present. If so, he had actual notice of the adjourned meeting in November, and of the objects of it, and as a Director when those dividends were declared, as well as stockholder, their proceedings must be taken as evidence against him, and be deemed valid and binding upon him so far as they acted within their chartered powers.

But though the stockholders themselves had the power, in their meetings, to inquire into and determine upon the regularity of the distribution made, in dividends, and to have ordered that the sums so paid be refunded, we are inclined to think they had no power to submit those questions or any other to the private judgment and award of others. They might determine themselves, but they have no power, by the charter, to submit the determination to others, against the consent of any of the stockholders. But if they had the power to do so, the award is not binding on Gratz, as he was not present when the investigation or award was made, nor had he any notice, constructive or actual, of the time and place of the meeting of the arbitrators.

*The directors of the Railroad Co. had a right to decide, but no power to submit to arbitration the question of the propriety of their former action in declaring a dividend; without the consent of the company the charter confers no such power.*

The books also of the corporation, and all the accounts, orders, resolutions and steps taken and noted in the same, are *prima facie* evidence against all the stockholders, as the books of a private company would be evidence against each member.

Placing out of view the award, it may be questionable whether it was not the duty of the directory, upon the evidence afforded them, by the reports to, and resolutions of the meetings, and the collation and exhibition of the accounts in these reports, and the sanction given to them by the meetings, (though there was no direct order upon the stockholders to refund,) connected with the evidence afforded by the books, to demand a restoration of the dividends paid out, and to have taken some steps to coerce their restitution. Be this as it may, it is very evident, at the time when these dividends were declared and divided out, there was no profits to divide, unless, as is contended

by the counsel for Gratz, the money paid in on forfeited stock should be credited to profits, or the annually accruing interest on the $150,000 borrowed, should be charged to cost of construction and not deducted from profits.

The stock subscribed was the capital of the Company subscribed and paid in for the construction of the road, and we cannot sanction the position, that the sum paid in on the stock ceased to be capital on the forfeiture of the stock, and by such forfeiture was converted into profits, to be divided among the stockholders as such. It was subscribed and paid in as capital, and treated and expended as such, and ought not to have been divided as profits. To distribute it out as profits before the work was completed, would be to squander a fund paid in, to be expended in the construction of the railway, and to which contractors and other creditors had a right to look for the payment of their demands, for work and labor done and to be done, in the construction, and for materials furnished and to be furnished. Though the fourth section of the charter, upon the failure of any subscriber to pay any instalment for the space of sixty days after the same shall be due and payable, authorizes the directory to forfeit the stock on which it is demanded, which may be sold for the benefit of the Company, yet it gives no authority to change the destination of the fund already paid in from its original object. Had a sale been made of the stock, and had it commanded a price, substituting the purchasers in the place of the former stockholders, the amount bid might have been carried to profits, or had a fair estimated value been fixed upon it, and that estimated value exceeded its par value, including the sum paid on it, that excess, perhaps, might have been carried to profits. But the stock was not sold, nor was any estimated value fixed on it, nor can we say that there was an excess to be applied to profits, nor was any so applied on the books of the Company, nor can we presume, from the state and condition of this Company, as it is now exhibited to us from its books, that the forfeited stock was worth, or would have commanded in market one cent. Had it been worth any thing, the presumption is that it would not have been forfeited, and if forfeited for other causes,

*Capital stock paid in for the purpose of carrying into effect the object of a company, does not, on being forfeited, become profit and liable to distribution as profit, before the object of its payment has been accomplished.*

GRATZ
*vs*
REDD.

the presumption is, if it were not worthless, that while the Company was strugling to raise the means necessary to complete the work, that they would have readily resorted to the expedient of selling the forfeited stock, not only to obtain the benefit of the surplus, if it would have commanded a premium, but also to obtain the aid of the purchasers in their payments of the accruing and unpaid instalments upon the stock so purchased. Be this as it may, it was not sold, but the fund paid was carried and set down to capital on the books, as it rightfully should have been, and not to profits, and the position that it should be credited to profits, is an after thought by Gratz or his counsel, not sustained by the cotemporaneous construction of the charter, and action of the Directors themselves, among whom was Gratz himself.

Nor can we sanction the position contended for, that the *interest annually accruing* upon the $150,000 borrowed under the authority and guaranty of the State, is chargeable to construction and ought not to have been deducted from and paid out of the annual profits, before a division was made. The money was borrowed in easement of the stockholders, and to relieve them from hasty and heavy calls upon their stock, which they might not have been able to meet without hardship and oppression, and the interest should have been paid and kept down out of the profits, if any, without withdrawing from or lessening the capital. A division of profits is not authorized by the 22d section of the charter, until "all the necessary *current and probable contingent expenses*" have been deducted. This annually accruing interest account not only should have been charged to expenses and deducted from the profits before a dividend was declared or distribution made, but an additional sum, in strict propriety, should have been set apart, from year to year, as a sinking fund for the ultimate payment of the principal. If annually accruing interest be chargeable to and paid out of the capital, it would, in process of time, swallow up the whole amount, leaving the Company with their debts unpaid, in bankruptcy and ruin, while the stockholders, for whose easement the power to borrow was allowed, are permitted to distribute among themselves

The $150,000 borrowed on the credit of the company, with the interest, should first have been paid before any dividend was declared.

the funds of the Company, under the false name of *surplus profits.*

If the money paid in on forfeited stock be set down to capital and not to profits, and the interest upon the sum borrowed be charged to expenses and deducted from the profits, together with other charges and deductions that should rightfully be made, there was then no surplus profits to divide, at either of the times that dividends were declared, as is apparent from the books of the Company and the exhibits in the case, as well as from the parol evidence adduced; and consequently, the sums paid out to stockholders, and credited on their stock, were paid out and credited, without the authority of, and against the express provisions of their charter, upon an erroneous basis and mistaken estimate of profits; and the sums so paid and credited must have been and were paid out of, and withdrawn from the capital. Indeed, according to the proofs now before us, taken from the books, and the uncontradicted reports made under the orders of the Company, and tacitly or impliedly sanctioned by them, and which unobjected to, uncontradicted or explained, we must take as proof, if the interest be not charged to expenses there was no profits to divide, but the expenses, even in that case, exceeded the profits. But charging the interest to expenses, and there was a palpable excess of expenses beyond the profits, and an obvious encroachment upon the capital, to the full extent of a sum equal to the amount divided and distributed among the stockholders.

1st. The question arises, therefore, whether the complainant, a judgment creditor, with a return of *"nulla bona"* on his executions, may not, in Chancery, subject the fund so improvidently paid out or credited, to the satisfaction of his judgments. If the directory could reclaim and recover back the sums so erroneously paid and credited, then could the complainant, upon the return suggested, subject the amount so recoverable from Gratz or any other stockholder, to the payment of his demand as a *chose in action,* under our statute. And we can perceive no good reason why they may not recover it back.

Extending to their acts the most charitable construction, it must be presumed that it was paid in mistake of

An execution creditor of a Company, with a return of *nulla bona,* may subject to the satisfaction of his demand money paid to a director of the Company for dividends illegally declared, and which might be recovered back by the Company as paid through mistake.

GRATZ
vs
REDD.

facts or law or both.   Indeed it is evident that it was paid and credited by charging to capital that which should have been charged to expenses and subtracted from the profits.   It was paid and credited against the express interdiction of the charter, not out of surplus profits but out of the capital, a fund provided and set apart by the charter to be applied in the construction of the road, and which alone ought to have been applied in discharge of debts and liabilities contracted in the accomplishment of that object.   It was paid to stockholders who had no claim upon the fund out of which it was paid, and no right to receive it.   It was paid and received without just claim, cause or consideration, legal right or obligation, and against the provisions of their fundamental law.   It was paid by their own chosen agents, in mistake of their powers and duties, and in breach of the trust confided to them.   It was paid in diminution of the capital, upon which laborers who had toiled and might toil in the construction of the work, and other, creditors had the *first and only claim*, until their entire demands were discharged.   It would seem, therefore, that so soon as the mistake was discovered, that in good conscience, morality, honor and justice, they ought to have refunded it, that it might be applied to the objects intended by the charter.   And the more especially would it seem that a moral, conscientious and legal obligation rested upon Gratz to refund, as he was a Director, and was present and sanctioned and concurred in the orders of the Board, by which those dividends were declared and divided.

It was determined by this Court in the case of *Underwood* vs *Brockman et als.* (4 *Dana*, 309,) and in the case of *Ray & Thornton* vs *the Bank of Kentucky*, (3 *B. Monroe*, 513,) that where money has been paid under a clear and palpable mistake of either law or fact, or both, essentially bearing upon and affecting or superinducing the payment, without cause or consideration, and which in law, honor and conscience, was not due and payable, and which in honor, morality and good conscience, ought not to be retained, it may be recovered back.

This being the well settled doctrine in individual transactions, we know of no reason or principle why it should

Money paid thro'
mistake by indi-
viduals, may be
recovered back,
where the mis-
take was either
of law or of fact,
or both, essen-
tially bearing up-
on and affecting
the payment, &c.
See (4 *Dana*,
309; 3 *B. Mon-
roe*, 513.)

not be made to apply to corporations. The management of their affairs must be confided to *men ;* those men are as liable to *mistakes* as others, and it would seem as just and proper that they should be permitted to correct those mistakes, and to be furnished with the aids of the law to do so as individuals. Indeed their right to restitution of the fund paid out would seem more striking, and the moral and conscientious duty of the payees to refund more palpable than in individual cases, since they are acting as Trustees for others, whose interest may be deeply affected by the mistake, and who had no means to guard against it; and since, also, they, as Managers and Trustees, might be rendered liable over to others for the whole amount so improvidently paid out. But the more especially should it have been refunded when the stockholders themselves had determined, in effect, that there was an error or mistake in the payments, and that the funds so paid out to themselves were abstracted from the capital, and the subsequent Directors, in effect, recognized the determination and ordered a restitution.

GRATZ
*vs*
REDD.
—The same rule applies to corporations & their agents, who are but Trustees.—
ARGU.

Nor can we perceive any difference in the obligation to refund when the payment was made in a credit on the stock, and when it was made in cash.

It is to be presumed that an instalment or instalments had become due and payable on a previous regular call made, equal to the sum so credited, or the dividend declared would not have been so credited, but would have been advanced to the stockholders in cash. And a payment thus made, in discharge of an existing liability, by the sanction and acceptance of the stockholder, was tantamount to, and in effect a payment to him, and may be recovered back in the same manner as if the payment had been made directly to him. But if this position be questionable as to others, it certainly is sustainable as to Gratz, who, as a Director, concurred in the order and accepted the credit. But here we are met by the objection, that the stockholder, but for the dividend and credit upon his stock, might have forfeited the same and escaped from further liability on his stock, and from that wreck and ruin into which the Company became subsequently involved. We have no evidence before us upon which we can base

a satisfactory presumption, that but for the small credit which was made on their stock at the time it was entered, that the stockholders would have forfeited their stock, and if there was, we are not prepared to admit, that the stockholders had the right, at their election, to forfeit by the terms of their charter.

Provision of the Railroad charter, 4th sec. respecting subscriptions and payments of stock, and the forfeiture and sale thereof.

Their charter provides one million as the capital of the Company, which is to be raised by the *subscription* of stock, "which may be subscribed for by individuals or corporations," and to that end, authorizes books to be opened "for the purpose of receiving subscriptions to the capital stock." And the 4th section provides: "that at every such subscription there shall be paid, at the time of subscribing to said Commissioners or their agent, appointed to receive such subscription, either in money or in a note, negotiable and payable at some Bank, at sixty days date, or longer, at the option of said Commissioners or their agents, the sum of one dollar on every share subscribed, and the residue thereof shall be paid in such instalments and at such times as may be required by the President and Directors of said Company: provided no payment shall be demanded until at least thirty days' notice of such demand shall have been given by said President and Directors; nor shall more than twenty-five per cent. of each share of stock be called for in any one year: but if the exigences of the Company shall require the payment on the stock to be made more rapidly than is provided for herein, or should the President and Directors, or a majority of the whole number elected, consider it expedient, for the purpose of *aiding* the stockholders or hastening the completion of the contemplated road, it shall be lawful for them to borrow, on the credit of the said Company, a sum of money not exceeding three hundred thousand dollars ; and if any subscriber shall fail or neglect to pay any instalment or part of said sub. scription, demanded according to the provisions of this section, for the space of sixty days next after the time the same shall be due and payable, the stock on which it is demanded *shall be forfeited* to the Company, and *may be sold* by the President and Directors for the benefit of the Company: but the President and Directors, by a ma-

jority of their whole board, *may remit* any such forfeiture on such terms as they may deem proper."

If the subscriptions were taken in the usual form, imposing an undertaking upon the subscribers to pay, and which is authorized if not required by their charter, then a common law obligation rested upon each subscriber to pay, independent of the forfeiture, and the affirmative remedy by forfeiture should not be construed to have been intended to take away the common law right to enforce payment on the subscriptions. The forfeiture was given as a cumulative and *summary remedy* to enforce payment, and might or might not be resorted to by the Company at *their election* or the election of *their directory*, whose duty it was to administer the affairs of the Company prudentially and carefully, with an eye to the objects of the trust confided to them, and they might forfeit or coerce by suit, as was best calculated, in the exercise of a sound discretion, to promote that end. Hence they *may remit* the forfeiture at their discretion and on *their own terms*.

It was intended as a privilege to the Company, and not to the stockholders or subscribers for stock; if to the latter and to be exercised at their own will and discretion, then after the whole of the stock was raised by subscription, and the work commenced, and contracts made, and liabilities incurred, labor performed and materials furnished, one half of the subscribers might forfeit the pittance paid in on their stock, and back out of the concern at pleasure, leaving the debts unpaid and the whole burthen upon the other half of the subscribers, without the means to pay the debts or to complete the work, without which it might be left an unprofitable wreck upon their hands. Good faith among the subscribers themselves, as well as between them and the public, and especially creditors, would repudiate such a construction. We are abundantly sustained in the construction which we give to the act, by the following authorities : *Johnson* vs *Bridge Company*, (2 *Bibb* ;) 1 *Pothier's Obligations*, 183–4 ; *The President, &c. of the Goshon and Minizink Turnpike Road* vs *Hurtin*, (9 *John.* 217 ;) *The Dutchess Cotton Manufactory* vs *Davis*, (14 *John.* 238 ;) *The Salem Mill Dam Corporation* vs *Joseph Ropes*, (6 *Pick. Rep.* 23 ;) *The*

GRATZ
*vs*
REDD.

The right to take a forfeiture of stock to a Company does not destroy or interfere with the common law remedy of enforcing payment of stock subscribed, and the right to take a forfeiture is a privilege to be exercised for the benefit of the Company.

*Worcester Corporation* vs *Aaron Willard*, (5 *Mass. Rep.* 80;) *The President, &c. of the Delaware and Schuylkill Canal Navigation* vs *Lawson*, (1 *Binney's Rep.* 70.) Nor is there any thing in the language of the section, "the stock *shall be forfeited and may* be sold," to change the construction which we have given to it.   It means no more than that the Company shall have the *power or privilege* to forfeit and sell, but they may also *remit*, which indicates most clearly, the discretionary privilege which was intended to be conferred.   In the last case referred to, from Binney's Reports, the charter provided, that if the instalments on the shares were not paid according to the terms provided, "the share *shall* be forfeited to the Company, and *may* and *shall* be sold by them, &c." yet the Court, without hesitation, determined, upon full argument, "that the power given to the Company was merely discretionary, that the penalty was in favor of the Company and might be *waived* at their pleasure."

If Gratz can be made liable on the ground of *mistake* in the payment to him, then no difficulty can arise against the complainant's right to proceed against him alone, without making the other shareholders parties, or calling upon them to contribute rateably.   For as the liability of each to refund to the Company is several, and for which a several assumpsit would lie, that the fund being capital and not profits, might be restored, and the whole sum applied to the payment of debts or in the completion of the work, the complainant would have an unquestionable right to proceed against either, for the funds in his hands as a *chose in action*, under the statute.

2d. But waiving this ground of liability, (and we do not deem it necessary to decide it, or wish to be understood as doing so,) and conceding that the mistake might not be so palpable as to authorize the amount to be recovered back, the question arises whether, according to equitable common law principles, independent of the statute, it may not be recovered back, or whether Redd, the complainant, under the general allegations and prayer of his bill, cannot be afforded relief in Chancery.   And here we are met with the objection that his bill seeks specific relief, to subject the fund in Gratz's hands as a *chose*

Directors of corporations are Trustees, and funds in their hands are liable for the debts of the corporation, and may be subjected by the Chancellor, and for a fraudulent misapplication of that fund, they are personally responsible, or the fund itself

GRATZ
*vs*
REDD.

may be pursued
into the hands of
one *not* an *inno-
cent* purchaser.

*in action*, or demand due and payable to the Company, and failing in his remedy in that aspect of the case, he can obtain it in no other. His bill, it is true, is inartificially drawn, with a view to relief in any other aspect than the one on which he has placed it. But it alledges facts which show that the complainant is a creditor of the Company; that he holds unsatisfied judgments; that nothing can be made out of the corporation by the ordinary legal remedies; that the Company is in an embarrassed and insolvent condition; that the fund sought to be reached is capital applicable to the payment of contractors and other creditors, and was set apart to complete the construction of the road; that it was paid into the hands of the Directors as Trustees, in trust, to be thus applied; that it has been paid out to Gratz under the pretence and denomination of surplus profits, when there was no surplus profits to divide, and the question is whether, under the facts in substance charged, it cannot be traced into the hands of Gratz, and applied to the objects of the trust; the payment of the debts contracted in the construction of the work, and among them Redd's debt, as it must be presumed that his debt must have been contracted, in some form, in the accomplishment of that object. That the Directors might be rendered personally liable for a fraudulent breach of trust, or gross negligence, or a faithless misappropriation of the trust fund placed in their hands, is unquestionable. They are mandatories and Trustees, bound to look to the law under which they act, and faithfully to administer the trust funds intrusted to their management, to the objects of the trust: *Percy et al.* vs *Millanden et al.* (3 *Louisiana Rep.* 569;) *Cunningham* vs *Pell et al,* (*Page's N. Y. Chy. Rep.* 612;) *Slee* vs *Bloom*, (19 *John.* 477;) *Briggs* vs *Puminan*, (8 *Cowan*, 387.) But though they may be made personally liable for a faithless misappropriation of the fund, the fund itself may be pursued into the hands of any one who is not an innocent purchaser or innocent recipient of the same, for a valuable consideration. If either has acquired it without consideration, or with notice of the trust, he holds it in trust, and may be compelled to disgorge at the instance of the *cestui que trust*, or of him who has the prior and better

GRATZ
*vs*
REDD.

claim to it. And as notice to the agent is notice to the principal, and the Directors are the selected mandatories and agents of the stockholders, it may be well doubted whether notice to the former is not notice to the latter. Be this as it may, a Chancellor will pursue and ferret it out, if it can be traced, that it may be applied to the purposes of the trust, (2 *Story's Equity,* 483,) and will do so though they be stockholders, (19 *John. and* 8 *Cowan, supra;*) *Wood and others* vs *Dunnivan et al.* (3 *Mason's Rep.* 308.)

Gratz not an innocent holder of the fund sought to be subjected.

We cannot regard Gratz as an innocent recipient of the fund in question. He had no claim upon it or any part of it, until all the debts were paid, nor perhaps until the entire work was completed. As capital the Directors, in discharge of their trust, were bound to apply it in the payment of contracts and other debts and liabilities incurred in the construction of the work. The creditors have the first and exclusive claim upon it till their whole demands are discharged. Gratz, as a stockholder, had a claim only upon the *surplus profits,* and upon his share of the residue of the capital only, after the whole purposes for which it was created had been satisfied. He is no creditor, as was contended by his counsel, having any claim upon this fund. His condition is not similar to that of a simple contract creditor, to whom an executor or administrator pays a debt, while there are debts of a higher dignity due and unpaid, (to whom he was compared by his counsel,) but rather like that of a distributee, who has no claim upon the funds in the fiduciary's hands until all the debts are paid; and while in the former case the creditor of higher dignity may not be permitted to pursue the money into the hands of the simple contract creditor, he, as well as all other creditors, will be permitted to pursue the fund into the hands of the distributee, though he may also render the fiduciary liable for his breach of trust in the payment; nor does it make any difference that the complainant's demand originated after the dividends were made. The capital, as we have said, was set apart by the charter as a fund for the completion of the work; all creditors, subsequent as well as prior, have a right to look to it and to

its faithful administration for the payment of their debts. These debts, whether prior or subsequent, as has been before said, it may be presumed were contracted, directly or indirectly, in the accomplishment of the grand object, and they have an interest in, and claim upon the fund set apart by law for their payment, and may hold the Directors responsible for its unfaithful distribution, or may follow it into the hands of the distributees who hold it as volunteer recipients, having no rightful claim upon it.

But it is contended, that if the fund distributed may be pursued and made liable to the payment of Redd's debt, that as Gratz received only his rateable share of the amount with other stockholders, that he is not equitably liable to refund more than his rateable share with them, of an amount sufficient to pay Redd's debt. If Redd's judgments were the only outstanding unsatisfied debts against the Company, or rather, if the stockholders had a right to retain the residue of the fund distributed amongst them, though the same be capital, after the payment of Redd's demands, then would the position contended for have reason and authority to sustain it: (3 *Mason's Reports*, 19 *Johnson and* 8 *Cowan's Reports, supra.*)

But it may be well questioned if there be outstanding and unsatisfied debts against the Company, more than sufficient to cover the whole amount of the fund so wrongfully distributed, or perhaps even if the work is not completed for which the capital was raised, whether as the whole fund should rightfully be restored that it may be applied to the purposes of the trust and the objects of its creation, the creditor who is most vigilant may not carve out of the fund an amount sufficient to pay his demand, and select and pursue the stockholder in whose hands it is, without bringing the other numerous stockholders and recipients of other portions of the fund and other creditors before the Court. In this state of case there would seem no good reason or propriety in requiring him to do so, inasmuch as the stockholders would have a right to retain no portion of the amount received; and the one pursued could not complain that injustice would be done him in not requiring others to contribute their equal rateable share in paying the debt; and the other creditors would

A creditor of a corporation may maintain his bill vs any member who is a Director of the corporation, who holds funds in his hands belonging to the Company, (of the capital stock,) without bringing all the members of the Company before the Court.

have no just ground to complain, that the creditor who was more vigilant than themselves, and who had first pursued his remedy against a portion of the fund, should be first satisfied. And to indulge in any other rule would amount probably, if not certainly, to a denial of justice to the creditors by reason of the multiplicity of persons that would have to be brought before the Court, and the multifarious, unconnected and complicated interests involved.

From the record before us it is obvious that the work is not completed, and it is strongly to be presumed that there are outstanding demands against the corporation, more than sufficient to cover the whole amount of dividends paid out. When the first dividend was declared the Company owed at least the amount guarantyed by the State, besides their probable liabilities to contractors and others, and in 1837, when the last dividend was made, they were indebted or liable on existing contracts about $130,000, over and above all their available means. When or how this large excess has been liquidated or extinguished, does not appear, nor whether any or what part or portion of it has been extinguished. It may, therefore, reasonably be inferred, that that amount or the greater part of it still remains outstanding, and the more especially as the Company, in a short time thereafter, sunk into hopeless bankruptcy, if this sum is still outstanding and unpaid, or even a little more than one-fourth of the amount, a sum of indebtedness sufficient to cover all the dividends paid out, is still unsatisfied. But waiving this view of the case and conceding that a creditor might not carve out of and pursue the fund in the hands of an individual shareholder, without bringing other shareholders before the Court, as Gratz was not only a shareholder but a Director at the time when the dividends were declared, it is competent for the complainant to pursue the fund in his hands and subject it to the payment of his debt, if the allegations of his bill and matters put in issue are such as to authorize him to proceed against Gratz in his double character. And we think they are.

The defective allegations of a bill    The bill, it is true, does not charge, specifically, that Gratz was a Director at the times those dividends were

declared: but it calls for the Company to exhibit copies of the orders, from the books, by which they were directed, and it appears from those orders that Gratz was a Director and was present and concurred in the same. Gratz answers and explicitly admits that he was a Director at the times when they were made, and does not controvert the fact that he concurred in them, but insists that they were rightfully made, and acknowledges that he received the money under those orders, which in itself, implies his assent to them. It has been frequently asserted by this Court, that the defective allegations of a bill may be often supplied by the admissions and statements of the answer, and we think this case falls within the operation of the rule, and they must be regarded as supplied. But if they are not, the answer of Redd to Gratz's cross bill asserts, in unequivocal terms, that "he was a Director when all the alledged dividends were made," and asserts that as his reason for selecting him out and sueing him rather than others. We cannot, therefore, deem it our duty to be governed by such technical rules as not to regard Gratz as before the Court, in his double character of Director and receiver of the fund in question, concurring in the orders by which it was paid out, and violating his trust in the orders for its payment and in its reception. Enough is alledged and brought to view in the pleadings to apprise him of the attitude which he is made to occupy before the Court, and to warn him of the necessity of making preparation to defend against liability in either or both aspects. To allow him to escape from responsibility under the circumstances shown, would be to stick in the bark, to pursue the shadow rather than the substance, technical form rather than the great ends of justice. If Gratz is before the Court and proceeded against as a Director as well as receiver, then is the proceeding against him alone, sustainable without bringing the other Directors or stockholders before the Court. For it is abundantly established by the authorities, that one Director or Trustee may be proceeded against alone, for a breach of trust, without bringing the others before the Court: (*Story's Eq. Pleadings*, 190–1 ; 5 *Page's N. Y. Chy. Rep. supra* ; 1 *Mylne and Keen*, 337 ; 7 *Condensed Eng. Chy. Rep.*

*may be supplied by the admissions of the answer.*

83 ;)  *Wilson* vs *Moore,* (4 *Russell,* 272 ;) *Wilkinson* vs *Parry,* (3 *Con. Eng. Chy. Rep.* 664.)

And as Gratz may be proceeded against alone, for a breach of trust, in ordering trust funds to be paid out, or if even it be questionable whether he should be made liable for concurring in an order made by himself, in conjunction with others, by which a trust fund was directed to be paid out to third persons, without making the others parties, we cannot doubt when he concurs in the orders and *receives* the fund under the order, that he may be rendered responsible by a proceeding against him alone, and recovery had against him, at least to the extent of the fund so received.

Though this is a hard case upon Gratz, and settles principles which may act severely upon others, who, in conjunction with him, with a laudable public spirit, embarked in a magnificent public enterprise, and with a liberality rarely equaled, contributed their means, and persevered in the project while a hope remained to complete it ; yet we are constrained to the opinion, from any and every view which we have been able to take of the case, that the Chancellor's decree is right and must be affirmed with costs and damages.

JUDGE MARSHALL—

Several positions, in which I am not prepared fully to concur, having been stated and argued in the opinion just delivered, I have thought it proper, without entering into any discussion, to state the view on which I concur in the affirmance of the decree: 1st. I concur in the conclusion of fact, that as the case appears in this record, there were no profits to divide when the several dividends alledged in the pleadings were made ; and in conclusion of law, that said declarations of dividends were therefore illegal and breaches of trust on the part of the Directors. 2d. I concur also in the opinion, that Gratz having as a Director, concurred in these illegal acts, and having received the benefit of them, in part by a credit on his stock and as to the residue in money actually paid to him, both together making up the illegal dividends upon

his stock, he is liable as a Trustee who has received the advantage of a misapplication of the trust fund in which he concurred, to the full extent of that advantage, whether received actually in money or in a credit on a debt which he was bound to pay for the benefit of the *cestui que trust*, and that he may be made liable to this extent and on these grounds in a suit against him alone.

In this view of the case, though not without some doubt whether Gratz should be regarded as being properly before the Court and bound to answer in his character, both of Director or Trustee and stockholder or receiver, I concur in the affirmance of the decree.

*Pirtle, Robinson & Johnson, Owsley & Goodloe, Clay & Robertson* for appellant: *Guthrie and Loughborough* for appellee.