JUDGE LINDSAY
delivered the opinion oe the court.
The Covington & Lexington Railroad Company, a’corporation created by the laws of the state of Kentucky, had constructed, and in the year 1858 was operating, its road from the city of Covington, in Kenton County, to the town of Paris, in the county of Bouibon, and had also secured a lease for the *477 term of ten years of the Maysvilie & Lexington Railroad, fxom Paris to the city of Lexington. Being largely indebted, the company made default in the payment of the interest falling due on certain of its bonds on the 1st of September, 1858, and on the 28th of November thereafter James Winslow, trustee, in a deed of trust made and executed April 8, 1853, to secure the payment of the principal and interest of these bonds, instituted a suit in equity in the Payette Circuit Court, setting up this default, and asking that the court place him in possession of and allow him to control and manage the property, rights, and privileges of the company, for the purpose of paying the interest so in arrear, costs of suit, etc.
On the 27th of December he amended his petition, and prayed an absolute sale of the property, rights, and franchises of the company. Other persons to whom the company was indebted, and who were interested in the subject-matter of the suit, made themselves parties thereto. After a feeble and ineffectual defense a judgment was rendered directing the sale as prayed for. On the 5th of October, 1859, all the property, rights, credits, and franchises of the company were sold at public auction for the sum of two million one hundred and twenty-five thousand dollars. Wm. H. Gedge, who was at the time one of the directors of the company, was the ostensible purchaser, but the actual purchaser was R. B. Bowler, who was also a director. Bonds were executed and securities deposited with the court’s commissioner, as was required by the terms of the judgment.
Branham, Desha, and other stockholders excepted to the confirmation of the sale; but, upon hearing, their exceptions were overruled, the sale confirmed, and the road and all its appurtenances delivered to the purchaser. By its judgment the court reserved “full power, by summary proceedings against the purchaser, to enforce compliance with all the terms of sale, and, until full payment thereof, to coerce said purchaser to *478 keep the road in good repair and order, so as to do the business of the railroad with safety and dispatch; and, in case of default on the part of the purchaser in mailing payment, or in complying with any of the terms of the sale, or in keeping the property in good order and repair/ may appoint a receiver or order a sale thereof.” This judgment can not be fully executed for many years, as a large number of the bonds of the company will not mature until the year 1885.
On the 1st of January, 1861, Bowler and certain other persons formed a joint-stock association for the purpose of acquiring, holding, and operating the road. Afterward, on the 1st of January, 1863, other persons became interested in this association, and the title was vested in Q,. A. Keith and Vm. Ernst, who were to hold as trustees for the parties beneficially interested, upon the terms and conditions and for the uses and trusts set out and declared in a deed made and executed to them by Bowler and wife on the 30th of Januazy, 1863.
On the 30th of September, 1865, the Covington & Lexington Bailroad Company instituted this action in the Kenton Circuit Court against the trustees Ernst and Keith and the persons for whom they held, including the widow and infant children, and the personal representatives of Bowler, who was then dead, seeking among other things to have the court adjudge that the defendants held the road in trust for the benefit of the company, and to have the same and the lights and franchises thereunto appertaining surrendered to it. This relief was asked upon two grounds: First — Because Bobert B. Bowler was a director of the company and a trustee for the stockholders at the time he purchased, and that by the well-established rules of equity his purchase inured to the benefit of his cestuis que trust. Second — Because prior to the sale he had violated his duties as trustee by willfully mismanaging, or causing the directors to mismanage, and misappropriate the funds of the company, with the view of bringing about the sale of the *479 road, in order that he might be enabled to possess himself of the property intrusted by the stockholders to his care and management.
Appellees answered, pleading: First, to the jurisdiction of the Kenton Circuit Court; second, estoppel by reason of a former adjudication; third, that the action was barred by lapse of time; fourth, specific and general denials of all the material allegations of the petition; fifth, that all persons interested, except the personal representative, widow, and heirs at law of Bowler, were purchasers in good faith for a valuable consideration, without notice, knowledge, or belief of the commission of any of the alleged frauds.
Certainly the Kenton Circuit Court has no power to set aside, vacate, or modify the orders or judgments of the Fayette Circuit Court; and it is equally clear that “the judgment or decree of a court of competent jurisdiction is not only final as to all matters determined by it, but it is also, in general, final as to every other matter incident to the cause which the parties might have put in issue and had litigated.” But in this action appellant can have relief without disturbing the judgment of the Fayette Circuit Court. That judgment may, in fact must, remain in full force and effect until completely executed. The sale to Bowler can not be set aside, nor. the order confirming it annulled, in this or any other collateral proceeding; but the Kenton Circuit Court, having jurisdiction of the persons to be affected by its judgment, may rightfully determine and declare whether or not the appellees who claim under this sale hold in trust for the railroad company.
The settlement of this question involves matters that were not pertinent to the suit in the Fayette court. The right of Winslow and the creditors of the company represented by him to have judgment for the sale of the road was made perfect by the default, for sixty days after demand, in the payment of the interest due on the company’s bonds. It was immaterial, so *480 far as they were concerned, whether this default resulted from, actual inability upon the part of their debtor to make the stipulated payment, or from, the bad faith and mismanagement of Bowler and his co-directors. Besides, one of the grounds relied on for relief is the charge that the directors, acting under'the influence and control of Bowler, willfully failed and refused to make an honest defense to ’Winslow’s suit, and needlessly permitted judgment to be rendered in his favor when it was within their power, by a proper application of the moneys of the company, to have redeemed the forfeiture and protracted the litigation until terms could have been made with the company’s creditors, and its debts paid out of the rapidly increasing earnings of the road. The company could make defense to Winslow’s suit only in its corporate capacity. With this defense Bowler, as a member of the board of directors, was charged. If he failed to perform this duty, those claiming through' him, or under and by virtue of his purchase, can not demand protection upon the idea that he failed to do all tilings necessary to induce the chancellor to exercise “a large equitable discretion in regard to the time and manner of enforcing Winslow’s rights.” It is of this failure the company now complains.
Even if it be true, as insisted by appellee, that the facts stated in the petition in this action would have constituted an equitable plea to the court of equity for relieving the company from the effect of the forfeiture incurred by the default in the payment of interest, and of giving time to redeem that forfeiture, yet as this equitable plea ought to have been interposed by the directors of the company, and was not, the failure to present it can not be regarded as a sufficient reason for protecting one of these faithless directors in the enjoyment of the profit he realized from his breach of official duty. .
The purchase at the decretal sale was the culminating act of *481 the fraudulent mismanagement charged against Bowler and his associate directors, and it is the title or interest he acquired under that purchase with which the appellant here seeks to be invested. Winslow’s judgment does not preclude it from seeking such relief in a new and independent action., and its right thereto was not and could not have been determined in his suit. A judgment in favor of appellant need not result in a conflict of jurisdiction between the Kenton and Fayette courts. It may be adjudged in this proceeding that Bowler held under his purchase, and that these appellees now hold, in trust for the company, and that upon the performance of certain prescribed conditions it is entitled not only to the property held, but to be substituted for the appellees in the management and control of that property, and yet it will be left for it to secure the exercise of this last-named right by applying to the Fayette court, and submitting to and performing the conditions imposed by its judgment upon the purchaser of the road, just as Ernst and Keith did when they appeared in that court, on the 11th of February, 1864, and claimed and were admitted to such right of substitution under and by virtue of the conveyance made to them as trustees, by Bowler and wife, on the 80th of January, 1863. Neither court will be called upon to subordinate itself to the other. The Kenton court will determine for whose benefit the appellees hold, and the Fayette court will require the party claiming under this determination to hold and enjoy the property, subject to the duty of performing the judgment in favor of Winslow in the exact manner prescribed by that judgment.
Bowler claimed that he had acquired under his purchase a vendible interest in the property. These appellees have distinctly recognized this claim by purchasing interests in the joint-stock association. Having an interest which may be sold and conveyed, if it be held in trust for another, and those holding it repudiate the trust, the beneficiary may undoubtedly *482 call Upon a court of equity to declare the existence of the trust, and to compel the recusant trustees to relinquish claim to the trust-estate.
Incident to this question of jurisdiction comes up the plea of estoppel. When the commissioner of the Fayette court filed his report of the sale to Bowler, certain stockholders, representing themselves and other stockholders, with no authority to speak for the corporation^ and not pretending to have any such right, excepted to its confirmation, among others, upon the ground that “W. II. Gedge, the ostensible bidder, and R. R. Bqwler, the actual bidder, were at the time of the sale directors of the company, and in the matter of said sale acted against the direct interest and express wishes of the stockholders, and purchased for their individual benefit.” In passing upon and overruling this exception the court determined the rights of those only who filed it. The stockholders, acting as individuals, could not raise an issue nor provoke a judgment that would bind the corporation. The company did not object to the confirmation of the sale, and raised no controversy as to the right of the chancellor to accept Bowler as a bidder, nor was it bound to raise this issue at that time; but even if under ordinary circumstances it would have been, this case would be an exception to the rule. There were then but eight directors in office; one of them was the bidder, and three others — John T. Levis, the president, William H. Gedge, and B. W- Foley — were sureties on the bonds executed by the bidder. By becoming parties to the transaction these four directors put it out of the power of the remaining four to act, and left the company without the legal capacity to object to the perpetration of the wrong of which it now complains. If Bowler desired to preclude the corporation by the judgment rendered upon the stockholders’ exceptions, he should have taken the proper steps to make it a party to the issue raised by those exceptions. He failed to do so, and its rights are not *483 affected by that judgment. (Brown v. LaCrosse R. R. Co., 2 Wall. 301; Angell and Ames on Corporations, sec. 370.)
We do not regard this as an action for the recovery of real property, nor an action for relief on the ground of fraud, in the sense in which those terms are used in our Revised Statutes. It is a suit to declare and enforce an implied or constructive trust. The cause of action, if one exists, accrued when Bowler finally and decisively repudiated the claim of appellant, and asserted title in himself. The limitation to actions of this character is five years. Bowler after the confirmation of the sale recognized the claim of the company, and professed to be ready and willing to surrender the property purchased. He published in one of the Cincinnati newspapers a proposition looking to this end, which stood open till the stockholders’ meeting on the 22d of December, 1859. This proposition was not accepted, and from that time forward he claimed the property as his own, and the statute then began to run in his favor. Five years six months and twenty-eight days elapsed before suit was brought. Bowler, however, died intestate on the 4th day of July, 1864. The statutory bar was not then complete. There was then no administration upon his estate in this state until February 13, 1865. If the personal representative of Bowler is a necessary party to this action, it was commenced in time. Assuming, as must be done in settling this question, that Bowler originally held as trustee for the corporation, he could not, if living, have, been required to surrender the property until he was placed in statu quo. He would be entitled to have restored to him, with legal interest, all moneys that he had rightfully expended for the benefit of the company, and to reasonable compensation for his services, and to have himself and his estate relieved from all liability to the plaintiff in the Fayette judgment. He would, however, be required to account to the company for the earnings of the road. As he is dead, this account can *484 not- be stated and a judgment rendered thereon, either for or against the appellant, without the presence of his administrator. The execution of the conveyance of January 30,1863, by which Ernst and Keith were constituted trustees for the joint-stock association, does not dispense with the necessity of making Bowler’s heirs and representatives parties. If a cestui que trust bring a suit against a third person, to whom the trustee has assigned the property in violation of the trust, the trustee should be made a party, for he is ultimately bound for the due fulfillment of the trust. (Story’s Eq. Pl., sec. 209; Bust v. Dennet, 2 Brown’s Ch’y, 225; Land v. Blanchard, 4 Hare, 28.)
Notwithstanding the assignment to Ernst and Keith, Bowler continued to occupy the relation of trustee for appellant, and in an action by the beneficiary to recover the trust-property his representative should be made a party. But if it be doubtful, in cases in which no settlement of accounts is necessary, whether the representative of the deceased trustee is an indispensable party, there can be no doubt but that Bowler’s heirs are necessary parties to this action. This suit is in respect to the property held, in trust for them, by Ernst and Keith. It is not prosecuted merely to establish a debt, or create a charge which the trustees will be compelled to satisfy out óf the trust-property, but it involves an absolute recovery of the property itself. In such a case the beneficiaries, who have the equitable and ultimate interest to be affected, as well as the trustees, ai’e necessary - parties. (Story’s Equity Pleadings, section 207; Mitford’s Equity Pleadings, by Jeremy, 176-179.)
It is also to be observed that the conveyance under which Ernst and Keith hold as trustees does not. invest them with that character of title that will authorize them to represent their cestuis que trust in a suit prosecuted for the recovery of the absolute trust-property. It is their duty as trustees to hold the property for the purposes and uses declared in the *485 deed. They have no power to sell, and are to hold “subject to the board of control” of the association; and if said “board of control” should appoint other trustees, they contract that they will convey the property to the new trustees upon the uses and trusts declared in the conveyance to them. They have no power even to convey, ’except as directed by the “board of control,” and then only for such purpose or purposes as may be calculated to promote the interests of those for whom they hold. Now it is a well-established rule of equity practice that if trustees have no power of disposition, persons having demands against the trust-property existing prior to the creation of the trust can not enforce these demands without making the persons claiming the benefit of the trust parties to their suit. (Story’s Equity Pleadings, sec. 140, and authorities cited.) As it would have been impossible to settle the controversy without the presence of Bowler’s heirs, the court should have brought them in of its own motion before proceeding to judgment, if appellant had failed to make them parties. (Civil Code of Practice, sec. 40.)
The death of Bowler so far interrupted the running of the statute as to authorize appellant to commence its action against his heirs and representatives after the expiration of five years from the accrual of its cause of action, provided it instituted its suit within one year after the qualification of his personal representative. It did commence its suit within a year after administration in this state, and its right to sue was saved by the exception stated. (Revised Statutes, chap. 83, art. 4, sec. 5.)
Bowler was not charged with the duty of selling the property intrusted to his management. Hence he did not purchase at his own sale; but he was acting as trustee for the stockholders and as agent and representative of the corporation, and was under obligations to use his best exertions in its behalf in all matters relating to its affairs, and especially in a matter imperiling its very existence. He purchased thé property of *486 his cestui que trust at a sale made pursuant to a judgment from which he and his co-directors might have prosecuted an appeal. He thereby placed himself in a position in which his personal interests were adverse to those of the corporation. He continued to hold his place as a director until the sale was confirmed, and the road and its appurtenances delivered to him by the court, and until he was superseded by the election of a new board. These facts are calculated to excite suspicion as to his faithfulness and diligence in the discharge of his fiducial duties.
He was made a director in 1857, and at once became the controlling member of the board. His skill as a financier was recognized by his associates, and it is manifest from the record before us that they deferred to him in all matters of importance. When he came into the directory he found the company greatly embarrassed. It had been forced to suspend the payment of interest accruing on some of its inferior securities. It was regarded as a matter of prime importance that its road should be put in good repair and its rolling-stock and machinery increased. It was estimated by a committee of directors, reporting June 10, 1858, that to accomplish the ends proposed would require about one hundred and forty-five' thousand dollars. To use this sum would place it out of the power of the company to pay the next installment of interest on the third-mortgage bonds, and it was resolved that the interest should not be paid. At the same meeting the directors appointed a select committee to report a plan of operations to the holders of the company’s bonds. Of this committee Bowler was a member. On the 19th of the month the committee reported that it would require nearly eight hundred thousand dollars to put the road into complete condition, and that the expenditure of the amount indicated would render it necessary that the company should suspend the further payment of interest on all its indebtedness for the period of five years. *487 This report was termed a ^proposition to bondholders,” and concluded with this extraordinary announcement: “Believing that it is to the interest of the bondholders to carry out the suggestion of this report, and that the repair and equipment of the road should be immediately commenced, the board will proceed to do so, presuming that you will ratify this report.” The directory adopted the recommendation of the committee, and immediately resolved, “ That so much of the resolution passed at the regular meeting of the board in- this month as declares the company unable to pay the December interest on the third-mortgage bonds be and the same is hereby rescinded and it was ordered- that such interest be paid out of any moneys belonging to the company. Without waiting for a conference with the company’s creditors the directors proceeded to advertise for proposals for the repairs and improvements deemed necessary to put the road in a first-class condition.
The holders of the second-mortgage bonds held a meeting on the 1st of November, 1858. They declined to accede to the “proposition to bondholders,” and demanded that the interest then due on their bonds should be paid by the 1st of January, 1859. The board of directors upon notification of this demand directed its president to inform the committee of bondholders .that it would not be complied with, in consequence of the absolute want of funds, but to give assurance that they had reason to believe that during the year 1859 the company “would be enabled to pay fully the coupons on the first and second-mortgage bonds, matured and maturing, up to that time, and regularly to continue to do the same at all times thereafter.” The result of this communication was the institution, on the 29th of November, 1858, of Winslow’s suit. The regular meeting of the stockholders of the company was •held on the 16th of December, 1858. The president in his report to this meeting did not allude to this suit, although he was served with process on the first day of that month. At *488 this meeting Bowler and his co-directors were continued in office.
Notwithstanding Winslow’s suit, and the assurance given that the company would be able in 1859 to commence and thereafter continue the payment of interest accruing on its first and second-mortgage bonds, the' directory, immediately after the re-election of the members of the board, proceeded to carry out the design of putting the road in complete condition. On the 18th of March, 1859, a committee, of which Bowler was a member, was appointed and clothed with full power to ascertain and adopt the best and most valuable improvements across Townsend’s Valley for the permanent future use of the railroad, and, after consultation with a competent engineer, to put the same under immediate contract. On the 28th of April the board determined, upon the recommendation of a committee composed of Bowler, Gedge, and Foley, to close a contract for the purchase of depot-grounds in the city of Covington, and on the 12th of May the payment of twenty-seven thousand dollars, the purchase-price therefor, was ordered.
Bowler was present and an active participant in every meeting of the board after his election as director, and until the road was sold and passed into his possession. The record discloses the further fact that during the most of the time he was acting for the company as director he persistently depreciated the value of its bonds, and yet constantly bought them up at their depreciated values. In the spring, summer, and autumn of 1859 Winslow was actively pressing his suit for a sale of the road, and Bowler was purchasing largely the inferior securities of the company, using the danger of the judicial sale, which, it was his duty to avert, if possible, as proof that the price he was willing to give was their full value. By purchasing these securities he placed himself in a position either to purchase the road when sold at greatly less than its value, or to realize immense profits upon the amounts *489 invested in them. Before the sale of the road was adjudged .he held more than one half of the third-mortgage bonds and three hundred, and sixty-nine thousand dollars of the income bonds of the company. Hence it was to his interest that the sale should be adjudged, and that no appeal should be prosecuted from the judgment when rendered. Accordingly in August, 1859, he was contracting with other parties interested in these inferior securities to establish a basis upon which to compromise their conflicting interests, should they or either of them purchase the road. From the moment that Bowler concluded to prepare for the purchase of the road his personal interests became antagonistic to those of the corporation, and he should have ceased to act as a director. Instead, however, of doing so, he held on to his position, and when we contemplate his official acts in the light of subsequent events we can not avoid the conclusion that as a member of the board of directors his influence was.used for the promotion of his personal ends. Instead of looking alone to the interests of the stockholders and creditors of the company, their rights were not only disregarded, but deliberately sacrificed, that profit might result to him.
It was perfectly plain that the interest accruing on the first and second-mortgage bonds must be paid as it matured, or terms made with the holders of those bonds. The holders of the third-mortgage bonds would naturally hesitate to resort to their legal remedies so long as the income of the company was faithfully applied to keeping the road in repair and to the payment of preferred debts. The cities of Covington and Cincinnati and the county of Pendleton had no option, so far as their bonds were concerned, except to pay them and the interest as it accrued, if the company failed to do so. The holders of the income bonds had no security at all, except the earnings of the road, and hence it was their interest to keep it in the hands of the company. Such being the situation of *490 affairs, the refusal of the directors to pay the interest on the first and second-mortgage bonds, and the diversion of the. company’s funds to the purchase of depot-grounds, and to the making of repairs and improvements on the road, which might have been readily dispensed with, evidences an intention on the part of those responsible for the line of conduct pursued to bring the road to a sale. In 1858, the prospect for an increase of business, and consequently of increased receipts, was by no means discouraging. There had been a steady increase in earnings during the years 1856, 1857, and 1858. In the last-named year the road, after the payment of all running expenses, earned $198,316.80. Twenty-five per centum of this amount would have satisfied the interest falling due on the first and second-mortgage bonds on the 1st of September, 1858. It was in the payment of this interest, which was less than forty-eight thousand dollars, that default was made. An agreement to pay it .by the 1st of January, 1859, which might have been made and performed, would have prevented the institution of Winslow’s suit. This the directory not only declined to do, but after suit had been commenced they, fully apprised of the inevitable result of their action, deliberately used the company’s moneys in the purchase of the extensive depot-grounds, and in making upon the road “ the best and most valuable” improvements.
The money used for these purposes, and in the payment of debts that were not pressing, and the collection of which the holders could not press without endangering their own interests, would have more than paid off the accrued interest on these bonds, and redeemed the forfeiture of Winslow’s mortgage. The whole amount of interest due and unpaid on the first and second - mortgage bonds at the time judgment was rendered in favor of Winslow was less than one hundred thousand dollars. In the year 1859, before the road was taken out of the hands of the company, its net earnings were *491 $227,734.77. Out of this sum the interest unpaid at the time the mortgages were foreclosed, as well as that falling due on the 1st of September, 1859, might have been paid, and fully one hundred thousand dollars devoted to' improving and repairing the road, and to the payment of the floating debt of the company.
The judgment of foreclosure and the sale of the road were the direct and necessary consequences of this misapplication of the company’s funds.
Bowler was not only an adviser and advocate of the nonpayment of the interest accrued and accruing on the company’s bonds (except of the third mortgages, in which he was largely interested), and the expenditure of its means in rendering the ■ road more valuable to the purchaser at the decretal sale; but in the month of June, 1859, while it was still possible to redeem the forfeiture, and leave Winslow without a cause of action, he was, as a party to Winslow’s suit, urging a speedy sale of the road, and resisting a postponement of the trial of the cause.
His conduct in the premises can not be defended upon the idea that his action as a director was approved by his co-directors. It is not denied that he exercised over them a controlling influence. Besides this, when we consider that he purchased the road when sold, through the agency of a co-director, W. H. Gedge; that the president of the company, John T. Levis, and two of the directors, W. H. Gedge and B. W. Holey, became sureties for him on the bonds he was required to give, and that he made this president the superintendent of the road immediately upon receiving possession of it; and that Levis and Gedge became partners with him in the joint-stock association formed in 1861; we may readily infer why it was that he was able to dictate a line of policy resulting so profitably to himself.
In March, 1859, Lucius Desha, the director for Harrison *492 County, resigned. A suitable person applied for the place thus made vacant, but the directory — Bowler, Levis, Gedge, and Foley being present, and constituting a majority of the members in the meeting — resolved that there was “ no urgent, indispensable necessity for the election of a director for Harrison County before the next regular meeting of the board.” The vacancy was never filled, and when Levis, Gedge, and Foley became parties to Bowler’s purchase the company was left without a directory.
There is no 'doctrine better settled nor more universally recognized than that an agent or trustee can not rightfully place himself in a position exciting in his own bosom a conflict between self-interest and the duty he owes to those for whom he acts. Generally such persons will not be allowed to ■ purchase and make profit out of the estate of those toward whom they occupy a confidential relation. A purchase made by the trustee when the eestui que trust is sui juris, and after the relation is understood to be dissolved, will not be upheld, except where “ there is a clear contract, ascertained to be such after a jealous and scrupulous examination of all the circumstances, and it is clear that the eestui que trust intended that the trustee should buy, and there is no fraud, no eoneealment, and no advantage taJcen by him as trustee.” (Coles v. Trecothick, 9 Vesey, 234.) Testing Bowler’s rights by this rule, and applying the doctrine announced to the facts of this case, we perceive no ground upon which a court of equity can rest a denial to appellant of the relief it seeks.
The company has not lost its right to demand relief because of acquiescence in Bowler’s purchase and possession. In no instance has it manifested an intention to abandon its claim to the property. Its refusal to accept the proposition made through the columns of a newspaper, at the stockholders’ meeting of December 22, 1859, does not prejudice its rights, nor raise the presumption of acquiescence on its part. To this *493 proposition conditions were attached to which the company was neither legally nor morally bound to accede. It had the right to have its property delivered to it by placing Bowler in statu quo. He could not take advantage of the possession he had wrongfully obtained to compel the company to satisfy debts then due and payable, much less to indemnify him against loss, on account of the investments he had made in its inferior securities. It was unreasonable and unconscientious in him to require, in addition to being relieved from all expense and liability incurred in making the purchase, that he should then be paid the amount with interest that he had invested in these securities. They were not then due, and, except for the unpaid interest, he had no right of action against the corporation. The distinction between this and the case of Roach v. Hudson (8 Bush, 410) is that in the one the party holding under an implied trust offered in good faith to execute the trust, asking only to have returned to him the money he had actually expended, and in the other the trustee demanded the immediate settlement of claims disconnected from and not growing out of the trust.
In addition to this fact, we can not regard Bowler’s proposition as having been made in good faith. He knew that for the time it was impossible for the company to comply with it. Its directory had been disorganized by the open defection of himself, Levis, Gedge, and Foley. Every cent of its available funds had been paid out under the orders of Bowler and his associates, and its only source of revenue was then in the hands of the faithless fiduciary who was dictating the terms upon which he would repair the great wrong perpetrated by him upon those who had trusted- him. The refusal to entei’t-ain this proposition and the failure to sue until nearly the requisite length of time to bar its action had elapsed, present no obstacle to the interposition of a court of equity in behalf of the company. At most, it but remained inactive when it might have *494 prosecuted its claim for relief. But merely remaining passive does not deprive a party of the right to seek relief, unless, in addition thereto, he does some act to induce or encourage others to expend their money or to alter their condition, and thereby render it unconscientious for him to enforce his rights. No such act upon the part of the company is shown in this case.
"We do not regard the question of the solvency of the company at the time of the Bowler purchase of the road as a matter of very great consequence. The fact that the judge of the Fayette Circuit Court regarded it as insolvent doubtless induced him to sell it, instead of leasing or placing it in the hands of a receiver. But notwithstanding that conviction upon the part of that judge, if the insolvent company had bid off the road at the whole amount of the debts embraced by his judgment, and made the necessary deposits, and had given the required securities for the performance of the judgment, its bid would certainly have been accepted. As a matter of law, the bid of a person representing the company and holding under his bid for its benefit was accepted. The company demands to be allowed the benefit, of its agent’s purchase, and it is not for him to say that his principal was and is insolvent, and therefore will not be able to hold the property against its creditors.
It is the duty of the company out of the earnings of the road to pay all of its debts. If this can not be done, then the members of the corporation, the holders of stock, are morally bound to take the necessary steps to regain the possession of the road, that it may be again sold for the benefit of those of the creditors of the corporation whose debts are not provided for, it being reasonably certain that a resale will result beneficially to them. We will not in this case inquire whether or not appellees hold the property for a resale. It is true that generally when a trustee purchases trust-property he holds for *495 a resale, but this rule is not universal. (Longest’s adm’r v. Tyler’s ex’r, 1 Duvall, 192.) Whatever the rule in this case may be, it can not enlarge the rights of the appellees. They can not demand that the property shall be again sold. When they are divested of title, and surrender the possession of the property to its owner — the company — its unpaid creditors may, if they choose, in the proper court, ask a resale; but it is not necessary in the adjudication of the questions involved in this cause that we shall anticipate such action upon the part of these unpaid creditors.
An inspection of the conveyance from Bowler and wife to Ernst and Keith shows that none of the appellees are purchasers without, notice of appellant’s claim. After providing that the property shall be held primarily for the payment of the debts embraced by Bowler’s bid, and reciting that it was expressly understood that said property was conveyed subject to the lien reserved by the judgment of the Eayette court, and that the trustees were always to provide for and protect that lien, the deed further provides “that should said railroad be taken from said trustees or said Bowler by any other claim in law or in equity, and said joint-stock association be deprived of the use, occupation, and profits thereof by any claim other than the bonded debts,” etc., Bowler shall refund to his associates the amounts paid by them respectively, in manner and form and out of a certain fund therein set out and described. As it was a matter of public notoriety that Bowler’s claim was not recognized by the company, and that for some considerable time after his purchase the possibility of a suit by the company to recover possession of the road was canvassed in the public prints, we have no difficulty in understanding why it was that those purchasing from Bowler should require this covenant of special warranty to be inserted in the deed. They had reason to believe that the company had not abandoned its claim to the road, and they knew that Bowler was a director *496 of the company when he bought it at the decretal sale. They had such notice of the infirmity of their vendor’s title as put them on inquiry, and hence they contracted for indemnity against possible loss by reason of this infirmity.
For the reason stated it is considered that the judgment of the Kenton Circuit Court dismissing appellant’s petition be reversed. The case is remanded for a settlement of the accounts between the parties upon the basis prescribed in the mandate of this court, and then for a judgment as to the ownership of the property in litigation and the rights of the appellant to possession and control of said property, conformable to the views expressed in this opinion.
The court filed the following mandate June 2, 1873:
Appellant is to be credited—
1. With any moneys arising out of the earnings of the road while in the custody of the officers of the Fayette Circuit Court, before possession was delivered to Bowler, and which may have been paid to him, or paid out for his benefit. Upon any such amount legal interest will be allowed from the date of payment.
2. To the gross earnings of the road from the time it was placed in Bowler’s possession. Legal interest will be allowed from the end of each year upon the amount earned in each year, and for the purpose of computing this interest it will be proper to adopt the date fixed by Bowler and his successors as the end of their current fiscal year.
Appellees are to be credited—
1. With all sums of money paid on the debts of the company under and pursuant to the judgment of the Fayette Circuit Court, and in satisfaction of the amount bid by Bowler at the decretal sale. Upon these sums interest will be computed from the date of payment.
2. With all sums of money expended by them in keeping *497 the road in good repair, and in keeping up the rolling-stock and machinery; also for proper improvements to the road, including fills, bridges, and depot-houses, and in the purchase or acquisition of additional rolling-stock, and in the purchase of necessary ' depot-grounds. Upon the sums so expended interest will be computed from the end of the current fiscal year within which the expenditure may have been made.
3. With the actual running expenses of the road, including reasonable compensation to the directory or board of control; also to the superintendent and other necessary and proper officers and employees. Upon the sums so expended interest will be computed from the end of each' current fiscal year.
In making up these accounts they should be separately stated:
First — As to the time Bowler held and run the road for himself.
Second — As to the time it was held and run by the first joint-stock association.
Third — As to the time it has been held and run by the present association.
But, unless these parties or their representatives, who are all appellees, agree as to the facts necessary to enable the court to state the accounts as last indicated, appellant is not to be delayed by any litigation that may arise between them, but shall have a settlement in the manner first pointed out, without any unnecessary delay.
If it shall be found that there is a balance due to appellees, they will be entitled to a judgment against the company for the. amount thereof; and until such judgment is satisfied appellant will not be allowed to proceed further with its suit. The chancellor will also put it upon terms either to pay off and satisfy such judgment within one year after its rendition or to suffer a dismissal of its petition.
If, upon the other hand, it shall be found that there is a *498 balance due to the company, judgment shall be rendered in its favor against the appellees, conforming to the separate statement of accounts allowed, if the same shall be made; if not, then a judgment' in gross against all the appellees personally liable for such balance.