CASE 80—ACTION ON BOND OF INDEMNITY—MAY 1.

## Blake v, Ray.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

JUDGMENT FOR DEFENDANT AND PLAINTIFF APPEALS.  REVERSED.

CORPORATIONS—ASSIGNMENT OF NOTE TO PRESIDENT.

Held:  The assignment by a corporation of a note to its president is valid, if made to reimburse the assignee for money advanced for the corporation, and if the corporation was solvent; and, there being testimony tending to establish each of these facts the question was for the jury.

JUDGE O'REAR DISSENTING.

WM. MARSHALL BULLITT FOR APPELLANT.

John S. Ray, appellee, being a judgment creditor of the Southern Land Improvement Co., had an execution levied upon certain furniture, &c., in Pineville, Ky. John D. Blake, appellant,

who was president of the Improvement Co., claimed that the furniture was his individual property, and so notified the sheriff of Bell county, who before making the sale, required Ray to give him an indemnifying bond. The bond was given with Ray as principal, and the Germania Safety Vault & Trust Co. as surety. Thereupon the sheriff made the sale and the property was bought in by Ray. The claimant brought this suit upon the bond. Code, section 643.

At the close of the plaintiff's evidence the Court directed a verdict for the defendant.

The only question in the case is whether the furniture was the property of the Improvement Co. and subject to an execution against it.

The facts are as follows:

Prior to March 27, 1893, the Improvement Company owned the Pineville Hotel and all the furniture in it. On March 27, 1893, the said company leased the hotel building to Mr. A. L. Toogood and sold him the furniture in the hotel for $1,476.68, and Mr. Toogood executed and delivered his note for $1,476.68 to said company in payment for the furniture. From March 27, 1893, until June 3, 1893, Mr. Toogood had been in possession of the hotel building, and the furniture and had occupied the hotel himself during that entire time.

Shortly after the sale of the furniture to Toogood, viz: On April 29, 1893, the Improvement Company by its secretary, R. Chichester, assigned and delivered the $1,476.68 note to John D. Blake to be credited upon his arrears of salary, and upon the $30,000 which he had advanced to the company. Blake accepted the note as cash at its face value on account of his debt, and it was so charged to him at the time upon the Improvement Company's books.

On June 3, 1893, Mr. Toogood having determined to quit the hotel business, made a written contract with Mr. Blake individually, and with the Improvement Co., by which two things were done. 1. The lease was cancelled by mutual consent. 2. Mr. Blake *purchased* the furniture from Toogood and paid him for it by surrendering to him the $1,476.68 note, which he, Blake, had received some weeks before from the Improvement Co.

As soon as the contract was executed, Toogood delivered possession of the furniture to Blake, who with his wife and daughters, then rented the hotel building from the Improvement Co. and ran it for some months, during all of which time Blake was in the possession of the furniture.

Under this showing we claim that the furniture was the individual property of Mr. Blake, and was not subject to the execu-

Blake v. Ray.

tion against the Improvement Co.  Swan, &c. Co. v. Frank, 148
U. S., 610; Newsom v. Kurtz, 86 Ky., 277; 11 Am. & Eng. Ency.
Law, 624; 14 Am. & Eng. Ency. Law (2d Ed.) 312; Holt v. Ben-
nett, 145 Mass., 437-439; Heidrick v. Silva, 89 Ky., 422, 427; Mc-
Kee v. Scobee, 80 Ky., 124; Grimes v. Grimes, 86 Ky., 511; Ger-
man Sec. Bank v. Jefferson, 10 Bush, 326; Given, Haynes & Co.
v. Gordon, 3 Met., 538; Whitehead v. Woodruff, 11 Bush, 209;
Temple, Barker & Co. v. Poynts, 2 Duvall, 276.

H. S. BARKER, ATTORNEY FOR APPELLEE.

The questions for decision are these:
1  Could the president and general manager of a corporation, insol-
vent at the time, transfer a part of its assets to himself?
2. Could three directors ratify the transaction where there were
only three out of five of the whole number of directors pres-
ent, and one of these three was the beneficiary of the ratifica-
tion in question.

I think clearly not.

It seems to me that the law is very plain and simple that a
director of a corporation can not trade with the corporation
for his own benefit; especially is that true when said direc-
tor is also president and general manager.   Morawetz on Pri-
vate Corp., secs. 517 and 518; Main & Jellico Mountain Coal
Co. v. Lotzpeitch, 14 Ky. Law Rep., 595.

OPINION OF THE COURT BY JUDGE BURNAM—REVERSING, FOLLOWED
BY DISSENTING OPINION OF JUDGE O'REAR.

The Southern Land Improvement Company, a corpora-
tion, owned the Pineville Hotel, and all of the furniture
in it. On the 27th of March, 1893, they leased the hotel to
A. L. Toogood, and sold the furniture to him for $1,476.68
taking his note in payment therefor.  Toogood took pos-
session under his lease, and operated the hotel until the
3d day of June, 1893.  On the 28th of April, 1893, while
Toogood was in possession of and operating the hotel,
the improvement company assigned, and delivered the
$1,476.68 Toogood note to the appellant, who was then the
vice-president of the company, to in part reimburse him
for advancements made to the company, and his account
was credited with the amount of the note on the books

of the company.  Subsequently, on the 3d of June, 1893, Toogood sold the furniture to the appellant in consideration of the surrender to him of the note which he had executed to the improvement company, and immediately delivered possession of the furniture to appellant; who thereupon rented the hotel from the improvement company, and operated it himself, until the 1st day of October, 1893, at which time the hotel company leased the hotel to one Garnier, and the furniture passed with the building, under an agreement from Garnier to buy it at a price thereafter to be ascertained by inventory and appraisement.  Before the sale to Garnier was finally closed, appellee, James S. Ray, obtained a judgment in the Louisville Chancery Court against the improvement company for $10,000.  Upon this judgment he caused execution to issue, directed to the sheriff of Bell county, Ky., into whose hands it regularly came, and was by him levied upon the furniture in question.  Before the sale under execution the sheriff was notified by appellant, John D. Blake, that he was the owner of the personal property levied upon, and that it did not belong to the improvement company.  Thereupon the sheriff required appellee, Ray, to execute a bond of indemnity before he would sell the property under execution, and the property was sold on the 29th of March, 1894, and delivered to appellee, who became the purchaser.  Whereupon appellant instituted this action against appellee upon the bond of indemnity, claiming damages in the sum of $2,000, which he alleged accrued to him by reason of being deprived of the title and possession of the furniture sold.  Appellee, by answer, denied appellant's title to the property, and also that it was of any greater value than $800.  Upon the issue so raised a trial was had, and at the termination of the

evidence for appellant the trial judge peremptorily instructed the jury to find for the defendant, and appellant prosecutes this appeal to reverse the judgment rendered pursuant to this verdict.

It is the contention of appellee that the transfer of the Toogood note to appellant by the improvement company was absolutely void, and conferred no title whatever upon him, for the reason that an officer of a corporation can not deal with it to his own advantage. We do not for a moment question the principle of law that it is the duty of the officers of a corporation to preserve its property as a trust fund, and that they can not be permitted to use their official place to promote their private interest, at the expense of the corporation or of its creditors; but there is no reason why a solvent corporation should not conduct its business in the ordinary way, and if, in the course of such business, it pays to one of its officers his salary or money, properly and justly due for advancements theretofore made to the company, it certainly can not be said that such a transaction is *per se* fraudulent and void. It appears from the testimony of appellant, and his statements are fully corroborated by the secretary of the company, that at the date of the assignment of the Toogood note the company was not only indebted to appellant for past-due salary largely in excess of the amount of the note, but also for advancements made by him to the company in the shape of loans, to enable them to meet their maturing obligations. And we are bound to believe from their uncontradicted statements that the improvement company at this date was solvent, and that the transfer was made in good faith, to pay a valid subsisting demand justly due by the company, which was at that time a going concern, transacting the business for

which it was incorporated. Appellant testifies that the capital stock of the company was $326,590, and that its bonded debt was $500,000, and that he owned $220,000 of the capital stock; that on the 1st day of July, 1892, he voluntarily advanced $15,000 to enable the company to meet its maturing indebtedness; that in October, 1892, he had negotiated a lease of about one-third of the improvemen company's property to the Central Appalachian Company of Belgium, a strong and solvent company, by the terms of which the Appalachian Company agreed to pay $25,000 rent for the first year, $30,000 for the second, and so on, increasing at the rate of $5,000 a year, until a maximum of $45,000 was reached, and for five additional years that the Appalachian Company was to pay $45,000, and that the company was also to pay certain royalties on coal, and for the use of the railroad, making the whole lease very valuable; that under this lease they actually paid $25,000 in cash in October, 1892, and $30,000 the following year; that this lease was in full force in the spring of 1893, and the improvement company was perfectly solvent when the Toogood note was assigned to him, and he thought that the enterprise would be successful, and make money for everybody connected with it.

It seems to us that there was certainly sufficient evidence, both of the validity of appellant's claim and the solvency of the company, to have authorized the submission of the question to the jury. This court, in a long line of decisions, has condemned the giving of peremptory instructions where the evidence conduces in any degree to establish the right of recovery. The trial judge erred in so doing in this case. For reasons indicated, the judgment is reversed, and the cause remanded for a new trial consistent with this opinion.

Judge O'Rear dissenting.

The Southern Land Improvement Company was a corporation owning certain coal and timber lands in Bell county, Ky., including an industrial plant, and buildings and lots in the city of Pineville. The total issue of its capital stock was $326,590, of what value is not shown. Of this stock, appellant, John D. Blake, owned $220,000. The company at this time owed a bonded indebtedness of over $500,000, and a floating indebtedness of over $200,000, not including a liability of $10,000 to appellee, James S. Ray. This was in 1893, at which time appellant was vice-president and general manager of the corporation. The $200,000 indebtedness had all been bought up by appellant with his own means, at 50 cents on the dollar. The corporation, known as the "Southern Land Improvement Company," hereinafter called the "Company," had defaulted on two of its installments of interest due on the bonded debt, and Blake had taken up the interest coupons, amounting to some $30,000. The company had leased all of its industrial or active properties to a foreign syndicate, styled the Central Appalachian Company, Limited, and had realized on the lease some $55,000. This money was evidently applied in discharge of the interest obligations above mentioned. That is the inference we gather from the testimony of Blake. The company being unable, because of lack of money or credit, to construct a spur of five miles of railroad required by the contract of lease with the Appalachian Company, the lease was suffered, from necessity, to lapse. This was the last struggling hope, it seems, upon which the company depended to weather the financial storms then upon it. It was in a state of insolvency, known to its general manager. It leased its hotel in this time (on March 27, 1893) to one

Toogood for a term and for a rental not disclosed in the
record.    Simultaneously with the lease, and manifestly
as part of the transaction, the company sold to Toogood
all the furniture in the hotel, at the recited considera-
tion of $1,476.68, evidenced by his note, payable $50 per
month, and secured by a lien on the furniture mentioned.
It is not shown nor claimed that the company had any
other personal property, save a few horses and wagons,
also transferred to Blake.    On the 29th April, 1893 (two
days before the first $50 payment on Toogood's note would
become due), Blake, as vice-president and general man-
ager, assigned, or caused the secretary of the company
to assign, to him (Blake) the Toogood note, carrying with
it, of course, the lien on the furniture.    The consideration
of this assignment is said to have been on account of
"part payment" to Blake of his salary of $5,000 per year
as vice-president and general manager, and expense ac-
count advanced by him.    Thirty-five days after this trans-
action, Blake, as vice-president of the company, rescinded
or canceled the lease of the hotel to Toogood, paying him
$100 in cash, and $100 in "stock of the Southern Land Im-
provement Company, paid to A. L. Toogood in full set-
tlement of his services and that of his wife.    The lease
and agreements made between A. L. Toogood and the
Southern Land Improvement Company dated March 27,
1893, commencing April 1, 1893, are hereby canceled, and
the property and supplies are hereby turned over to J.
D. Blake, the owner of the notes given therefor, and the
ownership and possession of the property relinquished
to him.    And all accounts, collections, and assets of the
hotel are hereby turned over, assigned and sold to the
Southern Land Improvement Company, with which to
pay the bills incurred in running the said hotel, and for

the supplies and furnishing supplies therefor." Blake tes-
tified that the furniture alone (not including supplies) was
worth much more than the sum for which they were sold
to Toogood.  He gives as the reason for such a transac-
tion the importance to the company of having the hotel
operated, and "boarding the agents and employes of the
company."  The agents and employes seem, by later de-
velopments, to have been Blake, his daughter, as stenog-
rapher, and Chichester, the bookkeeper.  In his testimony
Blake says the furniture was worth $2,282.75, even some
months after Toogood had given it up.  In August, after
the attempted transfer of hotel, and the rescission of the
contracts with Toogood, Blake alleges that the transfer
to him was ratified by the board of directors of the com-
pany.  At that meeting of the board there were present
appellant, J. D. Blake, William Low and Charles R. Chi-
chester, as directors.   The board then consisted of five
members.  Low was the attorney of the company, holding
$100 of its stock, evidently to nominally qualify him for
the position of director; Chichester was the secretary
and bookkeeper—both holding their positions at the favor
of Blake.  The following resolutions were adopted, which
Blake says was a ratification of the note transaction
above mentioned: "Pineville, Ky., August 8, 1895.  Meet-
ing convened as per adjournment, at 3 o'clock p. m.  Pres-
ent: J. D. Blake, Wm. Low and R. Chichester.  President
J. D. Blake in the chair.  At said meeting the following
resolutions were offered:  'Resolved that the action in
reference to lease of the hotel, April 1, 1893, to A. L. Too-
good, and final settlement with him upon his surrender-
ing same, be ratified and confirmed.'  Motion was made,
seconded, and the resolution was unanimously adopted.
The following resolution was then offered:   'Resolved,

that the sale of personal property to J. D. Blake and L. C. Barnett for advances made by each to this company be ratified and confirmed, and also the transfer to J. D. Blake of accounts due from the Central Appalachian Company, Ld., to amount of $3,852.50, upon advances made by him, be also ratified, and. that a proper consideration for the use of the personal property should be made while it remains in possession of the, same company.' Motion was made, seconded, and the resolution was unanimously adopted." Although Blake says the above was a ratification of the transfer to him of the company's property in the note and lien upon the furniture, his witness Chichester testifies as follows on that point: "Q. That resolution of August 8, 1893, ratifying the sale of personal property to J. D. Blake, included the transfer of the Toogood note to him, did it not? A. I did not so understand it. 2. What personal property did it cover, if it did not cover the Toogood note? A. It covered the electric light plant here, and included the stable, and live stock, two horses, wagons, etc. 3. And also the notes that had been transferred. to him, did it not? A. I can not say. 4. Why do you say that it does not cover that? It says 'personal property.' A. The personal property, as I understand it, was the stable, horses and electric light plant. 5. The note is personal property, is it not? A. Yes, sir. 6. Does it not come within the language of that resolution? A. It comes within the description, but I do not think it was intended to cover that. 7. Are you sure it was not intended to cover that? A. I am not sure." During these transactions appellee had a debt against the company for $10,000, upon which he was compelled to sue, resulting finally in a judgment in his favor for the amount named. The furniture had never been re-

moved during this time, nor had its possession changed, so far as could be noticed by observation.

The company being unable to pay appellee his judgment, and, indeed, being unable to meet its current and ordinary expenses, salaries of officers, interest on its debt, or any of its floating indebtedness, appellee, Ray, caused his execution to be levied on the furniture in question as the property of the company. Blake claimed the furniture as his, and the sheriff required of appellee, Ray, a bond indemnity, which was executed, whereupon the sheriff sold the property. This execution was levied November 22, 1893. On January 3, 1894, forty days thereafter, a receiver was appointed for the company as an insolvent. No other judgment debt is shown to have existed, save this one of Ray's. The sheriff had levied the execution before the receivership, and the bond was executed and sale made afterwards. Blake then sued Ray and his surety upon the bond of indemnity. Defendants pleaded, denying that Blake was the owner of the property. At the close of appellant's evidence, showing substantially the foregoing facts, the court gave the jury a peremptory instruction to find for appellee.

Upon these admitted facts, and the necessary and proper inferences deducible from them, had the title to this furniture passed to appellant, or was it subject to appellee's execution? To answer the foregoing query, we should determine the legal relationship of appellant, Blake, to the property in question, and to appellee, Ray, and the policy of the law governing that relationship. Blake was not only a director of the corporation owning the property and owing the debt, but he was its vice-president and general manager, paid a large salary for the faithful performance of the duties devolved upon him by virtue of his of-

fice. From a very early date the law has held directors accountable as quasi trustees of the corporate property. Cook, Stock & S. secs. 648, 649, and notes; Thomp. Corp. sec. 4021; Gratz v. Redd, 4 B. Mon. 194. Therefore they have not been allowed to acquire a title to, or any interest in, it hostile to the corporation (note to section 649, Cook, Stock & S.) in dealing with the corporation, even when the transaction was with a majority of the board of directors (Duncan v. Stanton, 30 Barb. 533). Their action is subject to the closest scrutiny by the law, and liable to repudiation by the corporation at the instance of any stockholder. Thomp. Corp. secs. 4032-4091; Gratz v. Redd, *supra*. If the transaction is detrimental to the corporation, the director will be required to make good the loss, or disgorge profits he may have realized. Cook, Stock & S. sec 649, and note; Currier v. New York W. S. & B. R. Co., 35 Hun. 355. No presumption of fairness or advantage to the corporation is indulged; the director must affirmatively show it. But in transactions concerning the corporation's property, where the director or officer is both seller and buyer, the transaction is *per se* fraudulent as to the corporation, and will be void or voidable, according to the circumstances. Cook, Stock & S. secs. 652, 653. If the director claim the property as a gift to him, or if he has not actually paid a consideration for it, which has been received and converted by the corporation, or if the director perpetrated an actual fraud in the transaction, such as personally misappropriating the corporation's funds or property, the transaction will be void. Pearson's Case, 25 Wkly. Rep. 618; Bank v. Horner, 39 Law J. Ch. 393. If the director, acting in good faith, actually pays a consideration for the transfer, and any advantage accrues to him, whether foreseen or not, it is voidable by the corpor-

Blake v. Ray.

ation, or at the instance of any stockholder; the director being in that case first reimbursed for his outlay. Risley v. Railroad Co., 62 N. Y. 240. If the transaction in this case falls under the first head, then the transfer was void, and the property was the property of the company; if under the second, it was voidable at the instance of any person who had the legal right to avoid it. Here the director, who was the general manager, having sole custody and control of the property, transfers it to himself, paying nothing therefor, giving up nothing that he had, yet taking a valuable asset of the company and appropriating it to his own use, without the knowledge or consent of his *cestuis que trustent*. He acted as both buyer and seller, naming the price and terms upon which he should acquire the title to the property to his exclusive use, the possession and control of which was confided to his trust for the benefit of those who placed him in his position. "One can not faithfully serve two masters whose interests are diverse" (Davis v. Mining Co., 55 Cal. 359) is a maxim of law and Scripture, equally true in each domain. "Constituted as humanity is, in the majority of cases duty would be overborne in the struggle." Cook, Stock & S., note to section 649. In Munson v. Railway Co. (N. Y. App.) 8 N. E. 355, a director of an insolvent corporation attempted to deal with himself as an individual, and in the controversy subsequently growing out of the transaction the court said: "The director stood in the attitude of selling as owner and purchasing as trustee. The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction, or refuses to inforce it, at the instance of

the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case. It prevents frauds by making them, as far as may be, impossible, knowing that real motives often elude the most searching inquiry, and it leaves neither to judge nor jury the right to determine, upon a consideration of its advantages or disadvantages, whether a contract under such circumstances shall stand or fall." In Railroad Co. v. Bowler's Heirs, 9 Bush, 468, we held: "There is no doctrine better settled nor more universally recognized, than that an agent or trustee can not rightfully place himself in a position exciting in his own bosom a conflict between self-interest and the duty he owes to those for whom he acts." In Bradley v. Farwell, 1 Holmes, 433, Fed. Cas. No. 1,779, it was held "that, where a corporation is insolvent, the directors can not turn into themselves its property for the purpose of paying a debt due from the corporation to them." But, it is argued, the director is only the trustee of the stockholders of the corporation, and unless they see proper to avoid his act no one else can complain. This was the original doctrine. To Mr. Justice Story, to whom the American people owe so much for the enrichment and enlargement of our equity jurisprudence, are we indebted for the extension of the principle of the trusteeship of the director to the interests of the creditor of the corporation as well as to its stockholders. Thomp. Corp. sec. 4150.

In one sense of the word, the assets of a corporation, especially of an insolvent one, are a trust fund, set apart, first, for the payment of its debts, and then for distribution of the surplus among its stockholders. Thomp. Corp. Id. The director must, of necessity, exercise the conscience, as it were, of the debtor, and conserve its prop-

erty to the end of the trust imposed upon it. Bent v. Priest, 86 Mo. 475. This doctrine that the director is a trustee for the creditors as well as for the stockholders of the corporation has long been recognized and frequently applied in this State. Gratz v. Reed 4 B. Mon. 178; Widrig & Co. v. Newport St. Ry. Co., 82 Ky. 511; Coal Co. v. Lotspeich (Ky.) 20 S. W. 377; Railroad Co. v. Bowler's Heirs, 9 Bush, 468.

It is argued that, if the act of Blake is to be avoided, it must be done in a direct proceeding for that purpose and by an action in equity. I have no doubt that a direct proceeding in equity would be available, but it need not be exclusive. The policy of the law should the rather favor direct, prompt, and inexpensive methods in aiding the creditor in the collection of his debt. If the director who has sequestered the corporation's assets is under legal obligation and duty to the corporation's creditors not to do so, then it would appear that the creditor may, in electing to avoid the director's conduct, either attack it in a direct action or ignore it. By causing the levy of his execution upon the property, he disavows the act of the director in unequivocal manner, and asserts his legal right to treat the property as that of the corporation. In case a debtor voluntarily transfers his property, it is void as to antecedent creditors. Formerly it was thought necessary for the creditor to have a return of "No property found" upon his execution against the debtor before he could proceed against the transferee to subject the property. Anderson v. Avery, 6 Ky. Law Rep., 363; Gilpin v. Davis, 2 Bibb, 418; Moffat v. Ingram, 7 Dana, 496; Worland v. Outten, 3 Dana, 478. Now, we hold that he can ignore the transfer, and cause his execution or attachment to be lev-

ied on the property in the first instance. Brown v. Brown, 91 Ky., 639, (11 S. W. 4); Wood v. Elliott (Ky.) 7 S. W. 624; Ky. St., sec. 1907.

In the case of an infant conveying his property during minority, it is said to be voidable. After his maturity he may avoid the transfer merely by ignoring it, and conveying to another. He may repossess himself of it without legal writ, if he can do so without a breach of the peace, or he may sue directly to cancel the conveyance. Utz v. Com., 3 Ky. Law Rep. 88; Moore v. Baker, 92 Ky. 518, (18 S. W. 363); 2 Greenl. Ev. sec. 367. If the doctrine be found that the director is a fiduciary to the creditor of the insolvent corporation with respect to corporate assets (and it has been too long held to be so to be now questioned), and that the director's transaction with the corporation's property, so far as he has obtained any interest in or advantage over it, is either void or voidable, at the instance of the creditor, is it not a sufficent disavowal of the direc- tor's unauthorized act to deny its validity, and treat the property as that of the corporation? And what more sig- nificant or effectual denial of the director's acts could be made by the corporation's creditor than by his electing to levy his execution on the chattel as the property of the corporation?

The growth of corporate interests has become so large, and deal so extensively with the property and business affairs of the country, that certainly no restric- tions of directors' liabilities and disabilities should be encouraged by the courts. When it is considered that the corporation's records are both made and kept by its di- rectors; that its servants and employes are their creat- ures, and to some extent dependent upon them for place and pay; that these records are not open to the general

Blake v. Ray.

public dealing with the corporation, nor open to its cred·
itors,—it would be extremely dangerous to business in-
terests, and manifestly unjust to those dealing with the
corporation, to allow its directors to make such favorable
and secret bargains with themselves as would destroy its
solvency, gaining material advantage to themselves, and
leave nothing for the creditor but an expensive suit in
equity.   The fact in this case will illustrate the dangers
possible to such a rule.   The corporation is hopelessly in-
solvent; all its assets incumbered beyond redemption save
the ones now in question; its vice-president and general
manager, on a salary of $5,000 per year, secretly, illegally,
affects to contract with himself, as it were, as director,
by which he takes all the unincumbered assets of the cor-
poration in part payment of his salary; no visible change
of possession or use of the assets follows; he manages
to hold the *status quo* in appearances for more than six
months (the statutory bar against actions for preferring
one creditor to another in contemplation of insolvency);
the successful director, then a nonresident, residing in a
far distant state, asks to be allowed to say to the corpora·
tion creditor, whom he has delayed and betrayed, "Follow
me with a suit in chancery."

In my opinion, this corporation was conclusively shown
by appellant's evidence to be insolvent.   Insolvency and
"going concerns" may not be incompatible conditions; for
a corporation insolvent in fact may, by sufferance of its
creditors by withholding suits, continue to exist as a
"going concern."   In my opinion, when a corporation is
in that financial condition that it owes more than it owns;
that it is unable in the ordinary course of its business,
to meets its obligations as they mature; that its current
expenses remain unpaid for a protracted period from in-

ability to meet them; that its unsecured debts are selling at 50 cents on the dollar, indicating a total destruction of its credit; that it only requires a sheriff with an execution for less than 3 per cent. of the value of its holding of the property to throw it into a state of hopeless and permanent bankruptcy,—that corporation is insolvent, in contemplation of law and in solemn fact, and. in my opinion, its managing directors are so far charged with notice of its condition that they should not be allowed to contract for themselves, with themselves, as directors, to the disadvantage of the creditors, whom they, in the company's condition peculiarly, probably exclusively, represent. Such, in effect, must have been the views of the judge below in giving the preemptory instruction to the jury; and notwithstanding my profound respect for the judgments of my learned associates, I feel constrained to dissent from the majority opinion in this case.