## Kentucky Title Savings Bank & Trust Co. v. Langan.

(Decided June 1, 1911.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Third Division).

1. Married Woman — Accomodation Endorser — Liability — Under section 2127, Kentucky Statutes, a married woman's estate can not be subjected to the payment of a draft on which she was an accommodation endorser, unless such estate shall have been set apart for that purpose by deed or mortgage or other conveyance.

2. Money Paid Under Mistake of Law or Fact—Recovery—Where a married woman pays a draft on which she is an accomodation endorser under the mistaken belief that she is liable thereon, she may recover the amount paid.

WM. MARSHALL BULLITT, KEITH L. BULLITT and ALEX. G. BARRETT for appellant.

O'DOHERTY & YONTS for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

On September 24, 1909, a man representing himself as W. M. Dunbar, called at the office of the Kentucky Title Savings Bank & Trust Company, of Louisville, Kentucky, and presented to its assistant cashier, Charles L. A. Johnson, a draft for $1,500.00, dated August 2, 1909, drawn by Drexel & Company, Bankers, of Philadelphia, Pennsylvania, on the Continental National Bank, of Chicago, Illinois, payable to the order of W. M. Dunbar. At the same time he presented the following letter:

"Mr. Johnson,

"Dear Sir: The bearer of this Continental cheque of Chicago, Mr. Dunbar, is a gentleman of high standing and in all his dealing—for which we will endorse him.

"Yours truly,
"DR. P. R. LANGAN,
"MRS. P. R. LANGAM."

Johnson then wrote the following note at the bottom of the letter:

"Will cash draft if endorsed by Dr. Langan and Mrs. Langan.

"C. L. A. JOHNSON a/c."

Johnson handed the draft and the letter to Dunbar, who returned later in the day and presented to Johnson the $1,500.00 draft, endorsed as follows:

"W. M. DUNBAR,
MR. P. R. LANGAN,
DR. P. R. LANGAN."

Thereupon Johnson cashed the draft. The next day, Dr. and Mrs. Langan growing suspicious, came to the bank and asked Johnson to telegraph Drexel & Company and inquire if they had issued such a draft. Drexel & Company replied, on Monday, September 27th, that they had not issued the draft in question. On the same day the Continental National Bank, of Chicago, on which the draft was drawn and which had forwarded a remittance draft to pay the draft in question, telegraphed declining to pay, and asked that the remittance draft be returned. The remittance draft reached Louisville on September 28th, and was immediately returned to the Chicago bank.

The next day, September 29, 1909, Johnson addressed a letter to Mrs. P. R. Langan and Dr. Langan, which, after advising them that the payment on the draft in question had been refused and the draft protested, concluded as follows:

"It will be necessary for you to pay us $1,504.96 covering the amount of the draft, costs and expense incurred, which we trust you will do promptly."

This letter was signed "Kentucky Title Savings Bank & Trust Co., by C. Johnson, Assistant Cashier." When this letter was received, Mrs. P. R. Langan was sick. On October 2nd, three days later, she, in response to the letter, went to the office of the Kentucky Title Savings Bank&Trust Company, where she had for some time kept a savings account, and carried with her her deposit book. Mr. Johnson made out a check for $1,504.96, which she signed.

Subsequently, Mrs. Langan, under the name of Carrie Langan, brought this action against the Kentucky Title Savings Bank & Trust Company to recover the amount so paid, on the ground that the payment was made under a mistake of law and in ignorance of her legal rights, and because of the wrongful, illegal demands, threats and persuasion of the defendants. The bank, by answer, denied any false representations, threats or illegal persuasions

on its part, and further pleaded presentation of the letter, the written endorsement of plaintiff and her husband, the non-payment and protest of the draft, and that notice was promptly given to all parties; also that plaintiff, with full knowledge of her legal rights, executed her check for the amount of the draft and protest fees.   A jury trial was had, and, upon the conclusion of all the evidence, the court gave a peremptory instruction in favor of plaintiff, and the bank appeals.

In addition to the facts above set forth, it appears from the record that, on September 23, 1909, Dunbar called up Dr. P. R. Langan, appellee's husband, at his residence, and expressed a desire or intention of purchasing a lot of land owned by appellee.   The doctor priced it to him at $3,600.00.   This was more than the amount which appellee had paid for the land, and was regarded as a good sale.   Dunbar left, saying he would look at the property and return the next day, September 24th.   He obtained from the doctor the letter of introduction above set out.   It will be observed that appellee's name is signed to the letter as "Mrs. P. R. Langam." Appellee claims that she did not sign the letter in question.   Appellant's testimony is to the effect that the signature is in her handwriting and resembles her handwriting on several checks which were introduced.   When Dunbar returned with the draft, he asked the doctor to endorse it and to get Mrs. Langan also to endorse it.   The doctor agreed to this.   He walked into the next room, where he found Mrs. Langan, and asked her to endorse the draft.   This she claims she declined to do.   She further testified that the doctor told her to write his name on the back of the draft, and she did so at his instance and in his presence, writing the name "Mr. P. R. Langan" as plainly as it could be written.   As the doctor was an old man, she claims she had often, at his request, written his name for him.   After writing the name as above indicated, the doctor went back into the parlor.   This was the last appellee saw of the draft until appellant required her to give a check for the amount of it and protest fees, on October 2, 1909.   When she went to the bank in response to appellant's letter, she presented the letter to Mr. Johnson and to Mr. Richard Langan.   In answer to a question, Mr. Johnson stated that they had sent the letter, and said "We hold you for it."   Later on, Johnson told appellee she was in duty bound to pay it.   Appellee claims she relied upon the statement made by

Johnson, and would not have paid the draft had not Johnson told her that they held her for it and she was in duty bound to pay it. She never received any of the proceeds of the draft.

For appellant, Johnson, the assistant cashier, testifies that he cashed the draft in question on the faith of Mrs. Langan's endorsement; that he thought at the time Mrs. Langan intended the signature on the draft to be her signature, and had unintentionally left off the ''s''. Both the doctor and Mrs. Langan came to the bank in response to the letter which he had sent. Mrs. Langan brought her deposit book, asked him to fill out a check for the amount necessary, which he did, and Mrs. Langan signed it. He then charged it off on her pass book. Her husband was present at the time. Did not use any coercion or threats of any kind, and did not state to Mrs. Langan that she was legally bound to pay the draft. Did not recollect exactly what he did say to her. Mrs. Langan recognized her liability and came to the bank in response to the former notice in regard to the protesting of the draft.

R. D. Langan, a cousin of appellee, testified that appellee told him that she signed the draft, but did not say anything about signing it for the doctor. She signed it in the presence of Dunbar, and when she did so, she saw the fellow's eye, and he seemed so pleased she thought she had done wrong, and notified the doctor. When appellee called at the bank, Mr. Johnson simply told her to sign the check to pay up the doctor's loss. Appellee was willing. She was crying while in the bank.

Other facts were brought out with reference to what took place between appellant, Drexel & Company, and the Chicago bank, but, as it is admitted in the record that the draft is a forgery, such evidence is not material to the question before us.

By section 2127, of the Kentucky Statutes, it is provided:

''No part of a married woman's estate shall be subjected to the payment or satisfaction of any liability, upon a contract made after marriage, to answer for the debt, default or misdoing of another, including her husband, unless such estate shall have been set apart for that purpose by deed of mortgage or other conveyance; but her estate shall be liable for her debts and responsibili-

ties contracted or incurred before marriage, and for such contracted after marriage, except as in this act provided.''

This provision was enacted for the purpose of protecting married women, and has been liberally construed by this court so as to effectuate the purpose of the legislature.

There being no proof to show that appellee received any of the proceeds of the draft, or that Dunbar was her agent for the purpose of collecting the draft, she, by signing the draft in question and not indicating her purpose to become bound in any other way, became bound merely as an accommodation endorser. (Kentucky Statutes, section 3730, subsection 63.) By her endorsement, therefore, she undertook in certain contingencies to answer for the debt, default or misdoing of another without having set apart her estate for that purpose by deed of mortgage or other conveyance. That being true, her contract of endorsement falls plainly within the purview of the statute, and was, therefore, not binding.

The rule in this State, adopted at an early day and followed by a long line of decisions, is that whenever, by a clear or palpable mistake of law or fact, essentially bearing upon and affecting the contract, money has been paid without consideration, which, in law, honor or conscience, was not due and payable, and which, in honor of good conscience ought not to be retained, it can and ought to be recovered. (Ray & Thornton v. The Bank of Kentucky, 3 B. Mon. 510; Titus v. Rochester German Insurance Co., 97 Ky. 574; Gratz v. Redd, 4 B. Mon., 178; McMurtry v. Kentucky Central R. R. Co., 84 Ky. 462.)

In this connection it is insisted that appellee, whether legally bound or not, was under a moral obligation to pay the draft; or that, if this be not the case, she had the right, voluntarily, to pay her husband's debt, as the section, supra, does not prevent her from doing what she pleases with her own money; and that in neither event would the money received be such that, in honor and good conscience, the bank ought not to retain it.

The principle of law announced in Ray & Thornton v. Bank of Kentucky, supra, must be construed with reference to the facts of that case. Ray and Thornton were accommodation endorsers on a bill of exchange. Owing to the fact that the bill was not forwarded for payment in time, Ray and all the endorsers were released from

liability. Ray, not knowing this fact, afterwards paid the bill, in ignorance of such legal exoneration. The court held that he could recover the money. We fail to see where that case differs in any important particular from the case at bar. There Ray, although originally bound, was released by the laches of the bank. After such release he paid the bill. Here appellee was never bound by her endorsement. As to her, it was absolutely void. If the bank, in the above case, could not in honor and good conscience retain the money, we fail to see upon what ground it can be contended that appellant in this case may in honor and good conscience keep the money.

In reaching this conclusion we assume that appellee signed her own name to the draft, intending it as her signature. She did not go to the bank for the purpose of voluntarily paying her husband's debt. Excluding from our consideration her statement, that Johnson told her she was legally bound and they would hold her for it, as the evidence upon that point is conflicting, it is manifest that she did go to the bank in response to the letter notifying her that it would be necessary for her to pay the draft. Believing that it would be necessary for her to pay it, she did pay it; and the evidence leaves no doubt that the payment was made under the mistaken belief that she was legally bound, when, as a matter of fact, she was not. While it is hard for the bank to lose the money under such circumstances, the features of this case are not harsher than those of any other case where the bank takes from a woman a contract to answer for the debt of another without securing it by a mortgage or other conveyance of her property.

Appellee kept her savings account entirely in appellant's bank. Her husband frequently cashed checks for her. When the assistant cashier wrote upon the letter of introduction that he would cash the draft if Dr. and Mrs. Langan endorsed it, he knew that Mrs. Langan was a married woman. That being true, appellant therefore discounted the draft not only with knowledge of the fact that the appellee was merely an accommodation endorser, but that she was a married woman.

There is nothing in the conclusion we have reached inconsistent with the rule laid down in the case of Rupple v. Kissel, &c., 24 Ky. Law Rep. 2371. In that case Rupple held a note for $1,000.00 on Mary Strasser, who owned

a lot adjoining the home of her sister, Catherine Kissel, which the latter wished to buy from her for $1,000.00. Miss Strasser and Mrs. Kissel then made an arrangement with Rupple, who was a friend of theirs, that he would accept Mrs. Kissel's note and surrender Miss Strasser's, explaining to him that Miss Strasser would convey her property to Mrs. Kissel. Mrs. Kissel and her husband executed to him a note for $1,000.00, and he surrendered Miss Strasser's note to her. Miss Strasser then conveyed the property to Mr. Kissel, reciting the consideration as paid. Rupple did not know this. The interest was paid on the note thus given to Rupple from year to year, until 1890, and several renewals were made, each signed by the husband and wife, the husband's name being placed first, and the wife making the payments of interest. At the time of the novation of the debt, Miss Strasser had another offer for the property, and there seems to have been no reason for the change, except the desire of Mrs. Kissel to get the property. Rupple's only motive appears to have been to accommodate his friends. Mr. Kissel died in the year 1894. There was insurance of $2,000.00 on his life, and out of this Mrs. Kissel, in the year 1906, paid to Rupple $600.00 on the note. Subsequently she became insane and was sent to an asylum. Rupple then brought suit against her and her committee to recover the balance of her debt. The committee pleaded her coverture in bar of the action, and also that the note was without consideration. He made his answer a counter-claim, alleging that the $600.00 paid by her on the note after her husband's death was paid by her in ignorance of her rights. Judgment was prayed for the recovery of this sum by the committee. On final hearing the court dismissed plaintiff's petition, and gave judgment against the plaintiff for the $600.00 and interest which Mrs. Kissel had paid upon the note after her husband's death. This court reversed the judgment of the lower court as to the $600.00 and interest, on the ground that Rupple and Mrs. Kissel, throughout the arrangements, regarded her as the principal debtor; that she made the arrangement with him and also made all the payments on the debt; that if the property had been conveyed to her, it or the proceeds would have been subject to the debt while in her hands; that she suffered it to be conveyed to her husband; that having done this, and recognizing the debt as hers, and being under, at least, a moral

obligation to pay, she paid the $600.00 freely and voluntarily. Upon these facts the court said: "We can not say, under the evidence, that this is money which in honor and good conscience she ought not to have paid, or that he ought not to retain it."

Being of the opinion that appellee was not bound upon the draft in question, and that she paid the same because of appellant's letter notifying her that it would be necessary to do so, we conclude that appellee made the payment under a mistake of law, when the money was not owing in law or conscience, and ought not in honor or good conscience to be retained by the appellant.

It follows that the trial court properly directed a verdict in favor of the appellee.

Judgment affirmed.